## CIRCUIT COURT OF THE CITY OF CLIFTON FORGE

The Diocese of Southwestern Virginia
of the Protestant Episcopal Church
in the United States of America et al.

v.

Kathryn Buhrman et al.

November 28, 1977

Case No. 1748

By JUDGE ROSCOE B. STEPHENSON, JR.

This is a suit brought by The Diocese of Southwestern Virginia of the Protestant Episcopal Church in the United States of America (the Diocese), by a trustee of St. Andrew's Episcopal Church of Clifton Forge, Virginia (St. Andrew's), and by twelve members of St. Andrew's against the remaining four trustees of St. Andrew's and the Parish Rector (now deceased) to obtain a judicial determination of the status of the St. Andrew's Parish real and personal property.

The undisputed material facts are as follows.

The trustees of St. Andrew's, one of whom is a complainant and four of whom are defendants, hold the legal title to two parcels of real property in the City of Clifton Forge. On one of these parcels stands the St. Andrew's Church and Parish House and on the other is located the rectory. The church and parish house parcel was conveyed by deed dated November 6, 1893, "for the erection of a church building to be used as a place of worship

by the Episcopal congregation of Clifton Forge Parish."[1]
The rectory parcel was conveyed by deed dated January 16, 1905, without a stated purpose, but to certain named persons as "Trustees of St. Andrew's Episcopal Church of Clifton Forge, Virginia." (Exhibits 1 and 2).

The Protestant Episcopal Church in the United States of America (The Episcopal Church) was established in 1789.

The Episcopal Church has a representative form of government similar, in many respects, to the government of the United States of America. Its government, as set forth in the Church's Constitution and Canons (Exhibit 3), consists, at the national level, of the Presiding Bishop (the chief executive officer) and the General Convention (the national legislative body which consists of a House of Bishops and a House of Deputies).

The Episcopal Church is a union of several dioceses (110 at this time). A diocese (being analogous to a state in our Republic) is presided over by a bishop (an officer similar to a governor of a state). The legislative body of a diocese is the annual council, a representative body.

At the local level of government there are parishes and missions. A parish is a local church which is self sustaining. Missions are either organized (which are partially supported by a diocese) or unorganized (which are fully supported by a diocese).

St. Andrew's is a unit of The Diocese of Southwestern Virginia, which in turn is a constituent part of The Episcopal Church. Throughout its history St. Andrew's has always been a component of The Episcopal Church. At first (1890-92) it was connected with what was then the Diocese of Virginia. From 1892 to 1919 it was a unit of the Diocese of Southern Virginia. Since 1919 it has been part of the Diocese of Southwestern Virginia.

Prior to 1974, St. Andrew's was a mission and, while occupying that status, The Episcopal Church and the diocese, of which St. Andrew's was a part, made substantial financial contributions to it. (Exhibits 12 and 13; testimony of Richard D. Tyree).

By a writing dated November 25, 1973, (Exhibit 5), the members of St. Andrew's (which was an organized mission of the Diocese at the time) formally petitioned to be

---

[1] The word "parish" had a slightly different connotation at that time. See testimony of Richard D. Tyree.

advanced to parish status. By that writing the petitioners solemnly promised and declared that the "Parish shall be forever held under the Ecclesiastical Authority of the Diocese of Southwestern Virginia, and in conformity with the Constitution and Canons of the Diocese of Southwestern Virginia, the authority of which we do hereby recognize." In the writing the members did "solemnly engage and stipulate that all real estate consecrated as a church or chapel, of which the said Parish is or may become possessed, shall be secured against alienation from the Protestant Episcopal Church in the Diocese of Southwestern Virginia, unless such alienation is in conformity with its Canons."

At the Annual Council of the Diocese held at Abingdon, Virginia, on January 25-27, 1974, parish status was duly granted to St. Andrew's. (Exhibit 6, p. 72).

By resolutions of October 17 and 31, 1976, (Exhibit 7), a substantial number of the members of St. Andrews formally withdrew from The Episcopal Church, effective after December 31, 1976,[2] and by letter dated December 12, 1976, (Exhibit 8 a-d), the Rector of the Parish resigned from the ministry of The Episcopal Church. These withdrawals from The Episcopal Church were precipitated by certain doctrinal changes which were either approved by the General Assembly[3] or which are proposed for approval in the future.[4]

---

[2] The resolution reads in pertinent part as follows:
"Be it resolved that the Episcopal Congregation in Clifton Forge, Virginia (technically and generally known as mentioned above), will not follow PECUSA in Her new ways, but will remain as we are and have been, retaining the religious beliefs and practices of ourselves and our forefathers, and

"Be it further resolved that we, the above mentioned Episcopal Congregation in Clifton Forge, Virginia (technically and generally known as mentioned above), will no longer be under the control or authority of PECUSA after the thirty-first (31st) day of December, 1976, A.D., (or the date of the deposition, deprivation, suspension or inhibition of the present rector, whichever comes first), nor will we support the programs, financial or otherwise, of PECUSA after the above date."

[3] At its meeting in 1976 the General Assembly approved the ordination of women as priests.

[4] There is a proposal to make certain changes in the 1928 revision of the Book of Common Prayer.

Since December 31, 1976, the withdrawn members of St. Andrew's and, until his death,[5] the resigned rector have continued to use, control and possess the real and personal property of St. Andrew's. They have continued to conduct church services in the St. Andrew's Church which have been without the sanction, supervision and control of the Diocese and The Episcopal Church.[6] Church officials and lay members of The Episcopal Church, including the complainants, have been precluded from using these properties for the furtherance of The Episcopal Church and its activities.

On December 16, 1976, a formal resolution was adopted by the Standing Committee of the Diocese (Exhibit 9) requesting the bishop of the Diocese to advise the rector, wardens and trustees of St. Andrew's that, "unless the resolutions adopted by the local congregation of St. Andrew's Parish on October 17 and 31, 1976, are rescinded, the use of St. Andrew's Parish property including church, parish house and rectory, by said local congregation or its minister after December 31, 1976, would constitute use of said property for purposes unrelated to the purposes of the Episcopal Church or Diocese, thereby effecting an abandonment of said property, or an alienation thereof without court approval and without the previous written consent of the Bishop and Standing Committee of the Diocese, in violation of the Episcopal Church Canons and the Canons of the Diocese." (Exhibit 9).

On January 15, 1977, a resolution was adopted by the Executive Board of the Diocese (Exhibit 10) whereby it determined "that by reason of the withdrawal of the former congregation of St. Andrew's Parish, Clifton Forge, Virginia, from the Episcopal Church, use of St. Andrew's Parish property. . . by said congregation after the effective date of said withdrawal constitutes an abandonment or illegal alienation of said property," and the committee on church property was directed to call upon the Trustees of St. Andrew's to transfer the title to and possession of the property to the Trustees of the Funds of the Protes-

---

[5] Father D. Robert Hunt died September 25, 1977.

[6] Although these services have been conducted independently of the Diocese and The Episcopal Church, they have followed the form and liturgy of the 1928 revision of the Book of Common Prayer.

tant Episcopal Church in the Diocese of Southwestern Virginia, Inc., as provided by Diocesan Canon 10. (Exhibit 4, pp. 178-179).

By letter, dated May 5, 1977, the Committee on Church Property of the Diocese of Southwestern Virginia wrote the Trustees, Rector and Wardens of St. Andrew's requesting that the parish property be vacated and that it be conveyed by the Trustees of St. Andrew's Parish to the Trustees of the Funds. (Exhibit 11). Non-compliance with this request resulted in the present litigation.

The defendants contend that the issue presented is purely an ecclesiastical one, and that a civil court is not permitted to resolve such a question because of the provisions of the First Amendment to the Federal Constitution and Article I, § 16, of the Constitution of Virginia, each of which stand for the well recognized doctrine of the separation of church and state.

It is true that both constitutions enjoin civil courts from deciding ecclesiastical disputes. In *Watson* v. *Jones*, 13 Wall. 679, 20 L.Ed. 666 (1872), the United States Supreme Court said:

> In this country the full and free right to entertain any religious belief, to practice any religious principle, and to teach any religious doctrine which does not violate the laws of morality and property, and which does not infringe personal rights, is conceded to all. The law knows no heresy, and is committed to the support of no dogma, the establishment of no sect. . . . All who unite themselves to such a body [the general church] do so with an implied consent to [its] government, and are bound to submit to it. But it would be a vain consent and would lead to the total subversion of such religious bodies, if any one aggrieved by one of their decisions could appeal to the secular courts and have them [sic] reversed. It is of the essence of these religious unions, and of their right to establish tribunals for the decision of questions arising among themselves, that those decisions should be binding in all cases of ecclesiastical cognizance, subject only to such appeals as the

organism itself provides for. 13 Wall., at 728-729, 20 L.Ed., at 676-677.

This court, therefore, is powerless to decide disputes involving church doctrine. The matters which prompted certain members and trustees of St. Andrew's Parish to withdraw from The Episcopal Church (i.e., the ordination of women to the priesthood, and proposed changes in the 1928 Revision of the Book of Common Prayer) are not the subject of review by a civil court.

The issue before this court, however, is not an ecclesiastical one, but it is one involving a determination of the ownership and control of church property. And civil courts are empowered to resolve such property disputes. *Presbyterian Church* v. *Hull Church*, 393 U.S. 440, 21 L.Ed.2d 658, 89 S.Ct. 601 (1969); *Norfolk Presbytery* v. *Grace Covenant Church*, 214 Va. 500, 201 S.E.2d 752 (1974).

In *Norfolk Presbytery* the Virginia Court said:

> We hold that it is proper to resolve a dispute over church property by considering the statutes of Virginia, the express language in the deeds and the provisions of the constitution of the general church. 214 Va. 505, 201 S.E.2d 756.

This court holds, therefore, that it is the proper tribunal to resolve the property dispute here presented.

In determining the ownership and control of church property, the court must look to the organizational structure of the church. If a church, in its organization and government, is entirely independent of any other church or general society, a majority of the members of a divided congregation have the right to control the use of the church property. *Baber* v. *Caldwell*, 207 Va. 694, 152 S.E.2d 23. In the case of a supercongregational or hierarchical church, however, the will of a majority within the local church or parish does not decide property rights. Such a church is subject to the constituted authorities of the general church. *Norfolk Presbytery* v. *Grace Covenant Church, supra,* 214 Va. 500, 201 S.E.2d 752.

From its beginning St. Andrew's, as a component of The Episcopal Church, has been part of a hierarchical or supercongregational church organization. Because

of this it is, and always has been, subject to the ecclesiastical authority and to the Constitutions and Canons of both The Episcopal Church and the Diocese.

In deciding the issue presented, the court, in accordance with the holding in the *Norfolk Presbytery* case, must consider the applicable law, "the deeds and the constitution of the general church."

By statute, Code §§ 57-8 and 57-13, the *legal* title (as opposed to the beneficial ownership) to all property of a local church (whether the church be independent or a unit of a supercongregational organization) is held by local church trustees who are appointed by the circuit court. Section 57-13 provides that "[a]ny one or more members of any *church diocese* or religious congregation may, in his or their names, on behalf of such *church diocese or congregation*, commence and prosecute a suit in equity against any such trustee *to compel him to apply such real or personal estate for the use or benefit of the church diocese or congregation*, as his duty shall require." (italics supplied).

In one of the deeds the conveyance was made to the church trustees "for the erection of a church building to be used as a place of worship by the Episcopal Congregation of Clifton Forge Parish." The other deed contains no statement of purpose, but the conveyance was made to named "Trustees of St. Andrew's Episcopal Church of Clifton Forge, Virginia." It is evident that the designated *cestui que trust* in each deed was a unit or component of the Protestant Episcopal Church in the United States of America within the then existing diocese. It cannot be successfully questioned that the abbreviated and commonly accepted name for that church is and always has been "The Episcopal Church."[7] Therefore, a reasonable interpretation of these deeds leads inescapably to the conclusion that the trustees cannot hold title to the subject property for persons or groups who are withdrawn from and not under the authority of The Episcopal Church.

In *Presbytery of Seattle, Inc. v. Rohrbaugh*, 485

---

[7] See, e.g., the Preamble to the Constitution adopted in 1789, which reads in part: "The Protestant Episcopal Church in the United States of America, otherwise known as The Episcopal Church (which name is hereby recognized as also designating the Church)." (Exhibit 3, p.1).

P.2d 615, *cert. denied* 405 U.S. 996 (Wash. 1971), this issue was resolved by the court in that case as follows:

> Turning to the merits, we find that the appellants (members of a withdrawn congregation) rest their appeal upon a contention that they are the "record titleholders" of the property and that no further inquiry need be made by the courts to determine the question of who is entitled to use and control the property. It should be noted at this point that the record title is in the church. The appellants evidently conceive that they comprise the church;
> . . .
> The appellants are not, as they contend, the record titleholders of the property. The record title is in The First Presbyterian Church of Seattle, a corporation which by its bylaws is subject to the discipline of the United Presbyterian Church and is governed by a Session which must act in accord with that discipline. The appellants have withdrawn from that church, but according to the decision of the Presbytery of Seattle, from which no appeal was taken, they had no right to withdraw from the church as a body and take with them the name of the church and its property. The pastor, the trustees, and the members of the Session who withdrew forfeited their right to govern the affairs of the church when they did so, according to the decision of the highest tribunal to which an appeal was taken, and consequently the appellants have no right to control the use of the property.

The next point to be considered is the constitution of the general church. In the *Norfolk Presbytery* case, the court, in its use of the phrase "the provisions of the constitution of the general church," gave that phrase a rather broad meaning which included contractual rights of the various levels and units within a supercongregational church. In that case the court rejected the theory that the church property is held subject to an implied trust for the general church, but, in doing so, said that "this does not mean that our civil courts

are powerless to prevent a hierarchical church from being deprived of *contractual rights in church property* held by trustees of a local congregation." (italics supplied) 214 Va. 507, 201 S.E.2d 758. The court in *Norfolk Presbytery* also said that the Presbytery "has the burden of proving that the Trustees of Grace Covenant have violated either the express language of the deeds or a *contractual obligation* to the general church." (italics supplied) 214 Va. 507, 201 S.E.2d 758.

In the present case the congregation expressly promised the Diocese that, upon St. Andrew's being granted parish status, the "Parish shall be forever held under the Ecclesiastical Authority of the Diocese of Southwestern Virginia and in conformity with the Constitution and Canons of the Diocese" and that "all real estate consecrated as a church or chapel, of which the said Parish is or may become possessed, shall be secured against alienation from the Protestant Episcopal Church in the Diocese of Southwestern Virginia, unless such alienation is in conformity with its Canons."

Absent these express promises, however, the contractual rights of the Diocese in the subject property are implicit in the Constitution and Canons of The Episcopal Church and in the Constitution and Canons of the Diocese. These constitutional and Canonical provisions are binding upon all units of The Episcopal Church, including St. Andrew's.

Title I, Canon 6, of The Episcopal Church provides in part:

> No vestry, Trustee, or other Body, authorized by Civil or Canon law to hold, manage, or administer real property for a Parish, Mission, Congregation, or Institution, shall encumber or alienate the same or any part thereof without the written consent of the Bishop and Standing Committee of the Diocese of which the Parish, Mission, Congregation, or Institution is a part, except under such regulations as may be prescribed by Canon of the Diocese. (Exhibit 3, pp. 31-32).

For a similar provision, *see* Title II, Canon 7 (Exhibit 3, p. 55).

Article 3 of the Constitution of the Diocese provides in part that:

> Every congregation within this Diocese, as now constituted and organized, or which may hereafter be constituted or organized, shall be benefited and bound equally by every rule and Canon which shall be framed by any Council, acting under this Constitution. (Exhibit 4, p. 169).

And Section 5 of Canon 13 of the Diocese provides that:

> Every promise and stipulation contained in the petition required for the organization of a Parish, as the same are set forth in Section 2 of this Canon, shall be binding upon every Parish now in union with this Council, the failure of any such Parish heretofore to agree thereto in writing to the contrary notwithstanding.

Constitutional and canonical provisions such as the foregoing are what gives The Episcopal Church its hierarchical character, and this supercongregational characteristic is the reason that the Diocese has a proprietary interest in the subject property.

Another canonical provision which illustrates the proprietary interest of the Diocese in the contested property is found in Diocesan Canon 10, which reads in pertinent part:

> (b) In the case of any property which is determined by the Executive Board to be abandoned property, the said Committee (on Church Property) shall take such steps, through the trustees holding the legal title thereto, or the survivor of them if there be any or, if there be no such trustee or trustees, then through any one or more members of the congregation, either to cause the title and possession of (where appropriate) said property to be transferred to the Trustees of the Funds of the Protestant Episcopal Church in the Diocese of Southwestern

Virginia, Inc., or to make sale thereof. (Exhibit 4, pp. 178-179).

The Executive Board, by a formal resolution, has determined that the St. Andrew's property has been abandoned within the context of church law, and it is most doubtful if that determination is subject to review by this court. *See,* e.g., *Presbyterian Church in the United States* v. *Hull Memorial Presbyterian Church,* 393 U.S. 440, 21 L.Ed.2d 658 (1969); *Watson* v. *Jones,* 80 U.S. (13 Wall.) 679, 20 L.Ed. 666 (1971). The undisputed evidence in the present case proved that the subject property is now being used exclusively by those persons who withdrew from The Episcopal Church and that their use thereof, not being under the authority of The Episcopal Church, is alien thereto.

However, if abandonment does not pertain, those who no longer claim allegiance to The Episcopal Church have appropriated the subject property to their own uses, contrary to the express promise that the parish property "shall be secured against alienation from the Protestant Episcopal Church in the Diocese of Southwestern Virginia." Furthermore, their uses are in contravention of Diocesan Canon 21, which provides:

It shall not be lawful for the Trustees of a congregation, in whom is vested the title to any real estate, such as a rectory, parish house, or any other real estate to encumber, alienate, or lease for more than three years said property belonging to said congregation without the previous written consent of the Bishop of the Diocese, acting with the advice and consent of the Standing Committee. (Exhibit 4, p. 189).

The defendants contend that there has been no *alienation* of the property because, as they argue, alienation means an absolute conveyance. In 3 C.J.S., *Alienation,* p. 773, the following statement is made:

In a special sense, the term (alienation) has been held to signify the wrongful transfer of property to another; and has been defined as a wrongful conversion of property.

By whatever term the defendants' actions are called (be it abandonment, alienation or something else), it is undisputed that the local church trustees who have withdrawn from The Episcopal Church claim to hold title to the subject property for those persons who have likewise withdrawn from The Episcopal Church. *See* Paragraph 5 of Defendants' Answer. Moreover, they have expressly renounced the control and authority of The Episcopal Church. Their appointment as trustees was for the purposes of a church which they have since renounced, and they have placed the St. Andrew's property beyond the reach, use and control of those parishioners who have remained loyal to The Episcopal Church as well as the Diocese to which St. Andrew's belongs.

The court holds, therefore, that the withdrawn trustees, having violated the express language of the deeds and their contractual obligations to the general church, have no further right or interest in the subject property, that neither they nor the others who have renounced The Episcopal Church have any proprietary or possessory rights in said property. Until such time as other trustees, loyal to The Episcopal Church, can be appointed, the lone remaining trustee, being one of the complainants, shall hold title to said property for the sole benefit of St. Andrew's as a unit of The Protestant Episcopal Church in the United States of America as contemplated by and in accordance with the deeds and the constitution of that church.