## PRESBYTERIAN CHURCH IN THE UNITED STATES ET AL. *v.* MARY ELIZABETH BLUE HULL MEMORIAL PRESBYTERIAN CHURCH ET AL.

No. 71.   Argued December 9–10, 1968.—Decided January 27, 1969.

*Charles L. Gowen* argued the cause for petitioners. With him on the brief were *Robert B. Troutman* and *Frank S. Cheatham, Jr.*

*Owen H. Page* argued the cause for respondents and filed a brief for respondents Eastern Heights Presbyterian Church et al. *Richard T. Cowan, Frank B. Zeigler,* and *James Edward McAleer* filed a brief for respondent Mary Elizabeth Blue Hull Memorial Presbyterian Church.

Briefs of *amici curiae,* urging reversal, were filed by *George Wilson McKeag* for Thompson, Stated Clerk of the General Assembly of the United Presbyterian Church in the United States et al., and by *Jackson A. Dykman* and *Harry G. Hill, Jr.,* for the Right Rev. John E. Hines, Presiding Bishop of the Protestant Episcopal Church in the United States.

Briefs of *amici curiae,* urging affirmance, were filed by *William J. McLeod, Jr.,* and *W. J. Williamson, pro se,* for Williamson, Secretary of Concerned Presbyterians, Inc., and by *Alfred J. Schweppe* for Laurelhurst United Presbyterian Church, Inc., et al.

MR. JUSTICE BRENNAN delivered the opinion of the Court.

This is a church property dispute which arose when two local churches withdrew from a hierarchical general church organization. Under Georgia law the right to the property previously used by the local churches was made to turn on a civil court jury decision as to whether the general church abandoned or departed from the tenets of faith and practice it held at the time the local churches affiliated with it. The question presented is whether the restraints of the First Amendment, as applied to the States through the Fourteenth Amendment, permit a civil court to award church property on the basis of the interpretation and significance the civil court assigns to aspects of church doctrine.

Petitioner, Presbyterian Church in the United States, is an association of local Presbyterian churches governed

by a hierarchical structure of tribunals which consists of, in ascending order, (1) the Church Session, composed of the elders of the local church; (2) the Presbytery, composed of several churches in a geographical area; (3) the Synod, generally composed of all Presbyteries within a State; and (4) the General Assembly, the highest governing body.

A dispute arose between petitioner, the general church, and two local churches in Savannah, Georgia—the respondents, Hull Memorial Presbyterian Church and Eastern Heights Presbyterian Church—over control of the properties used until then by the local churches. In 1966, the membership of the local churches, in the belief that certain actions and pronouncements of the general church were violations of that organization's constitution and departures from the doctrine and practice in force at the time of affiliation,[1] voted to withdraw from the general church and to reconstitute the local churches as an autonomous Presbyterian organization. The ministers of the two churches renounced the general church's

---

[1] The opinion of the Supreme Court of Georgia summarizes the claimed violations and departures from petitioner's original tenets of faith and practice as including the following: "ordaining of women as ministers and ruling elders, making pronouncements and recommendations concerning civil, economic, social and political matters, giving support to the removal of Bible reading and prayers by children in the public schools, adopting certain Sunday School literature and teaching neo-orthodoxy alien to the Confession of Faith and Catechisms, as originally adopted by the general church, and causing all members to remain in the National Council of Churches of Christ and willingly accepting its leadership which advocated named practices, such as the subverting of parental authority, civil disobedience and intermeddling in civil affairs"; also "that the general church has . . . made pronouncements in matters involving international issues such as the Vietnam conflict and has disseminated publications denying the Holy Trinity and violating the moral and ethical standards of the faith." 224 Ga. 61, 62–63, 159 S. E. 2d 690, 692 (1968).

jurisdiction and authority over them, as did all but two of the ruling elders. In response, the general church, through the Presbytery of Savannah, established an Administrative Commission to seek a conciliation. The dissident local churchmen remained steadfast; consequently, the Commission acknowledged the withdrawal of the local leadership and proceeded to take over the local churches' property on behalf of the general church until new local leadership could be appointed.

The local churchmen made no effort to appeal the Commission's action to higher church tribunals—the Synod of Georgia or the General Assembly. Instead, the churches filed separate suits in the Superior Court of Chatham County to enjoin the general church from trespassing on the disputed property, title to which was in the local churches. The cases were consolidated for trial. The general church moved to dismiss the actions and cross-claimed for injunctive relief in its own behalf on the ground that civil courts were without power to determine whether the general church had departed from its tenets of faith and practice. The motion to dismiss was denied, and the case was submitted to the jury on the theory that Georgia law implies a trust of local church property for the benefit of the general church on the sole condition that the general church adhere to its tenets of faith and practice existing at the time of affiliation by the local churches.[2] Thus, the jury was instructed to determine whether the actions of the general church "amount to a fundamental or substantial abandonment of the original tenets and doctrines of the [general

---

[2] This theory derives from principles fashioned by English courts. See, e. g., Craigdallie v. Aikman, 1 Dow 1, 3 Eng. Rep. 601 (H. L. 1813) (Scot.); Attorney General ex rel. Mander v. Pearson, 3 Mer. 353, 36 Eng. Rep. 135 (Ch. 1817). For the subsequent development of the implied trust theory in English courts, see Note, Judicial Intervention in Disputes Over the Use of Church Property, 75 Harv. L. Rev. 1142, 1148–1149 (1962).

church], so that the new tenets and doctrines are utterly variant from the purposes for which the [general church] was founded." The jury returned a verdict for the local churches, and the trial judge thereupon declared that the implied trust had terminated and enjoined the general church from interfering with the use of the property in question. The Supreme Court of Georgia affirmed, 224 Ga. 61, 159 S. E. 2d 690 (1968). We granted certiorari to consider the First Amendment questions raised.[3] 392 U. S. 903 (1968). We reverse.

---

[3] We reject the contention of respondent local churches that no First Amendment issues were raised or decided in the state courts. Petitioner's answer and cross-claim in each case included an express allegation that the action of respondents in appropriating the church property to their use was "in violation of the laws of Georgia, *the United States of America,* and the Southern Presbyterian Church." (Italics supplied.) At trial, petitioners' counsel objected to the admission of all testimony "pertaining to [the] alleged deviation from the faith and practice of the Presbyterian Church in the United States" because that question was "exclusively within the right of the Presbyterian Church in the United States through its proper judicial body to determine." On appeal, petitioners again contended "that questions of an ecclesiastical nature concerning whether or not a church has abandoned its tenets [*sic*] and doctrines, or some of them, are exclusively within the jurisdiction of the church courts and should not be submitted to a jury for determination as this would destroy the doctrine of separation of church and state." Petitioners thus clearly raised claims under the First Amendment as applied to the States by the Fourteenth Amendment. *Kedroff* v. *St. Nicholas Cathedral,* 344 U. S. 94, 116, 119 (1952). The Georgia Supreme Court considered and decided these claims. "In considering this contention [that the petitions raise ecclesiastical questions which are exclusively within the jurisdiction of the church, not of civil courts, and therefore that respondents could not maintain their action]," the court said, "we are mindful that 'The traditional American doctrine of freedom of religion and separation of church and state carries with it freedom of the church from having its doctrines or beliefs defined, interpreted, or censored by civil courts.'" 224 Ga., at 68, 159 S. E. 2d, at 695. The court concluded, however, that the trial court did not violate the doctrine. Citing Georgia Code Ann. § 22–408, which pro-

It is of course true that the State has a legitimate interest in resolving property disputes, and that a civil court is a proper forum for that resolution. Special problems arise, however, when these disputes implicate controversies over church doctrine and practice. The approach of this Court in such cases was originally developed in *Watson* v. *Jones,* 13 Wall. 679 (1872), a pre-*Erie R. Co.* v. *Tompkins* diversity decision decided before the application of the First Amendment to the States but nonetheless informed by First Amendment considerations.[4] There, as here, civil courts were asked to resolve a property dispute between a national Presbyterian organization and local churches of that organization. There, as here, the disputes arose out of a controversy over church doctrine. There, as here, the Court was asked to decree the termination of an implied trust because of departures from doctrine by the national organization. The *Watson* Court refused, pointing out that it was wholly inconsistent with the American concept of the re-

vides: "Courts are reluctant to interpose in questions affecting the management of the temporalities of a church; but when property is devoted to a specific doctrine or purpose, the courts will prevent it from being diverted from the trust," the court held that "a trust [in favor of the general church] is conditioned upon the general church's adherence to its tenets of faith and practice existing when the local church affiliated with it and . . . an abandonment of, or departure from, such tenets is a diversion from the trust, which the civil courts will prevent." 224 Ga., at 68, 159 S. E. 2d, at 695.

[4] "*Watson* v. *Jones,* although it contains a reference to the relations of church and state under our system of laws, was decided without depending upon prohibition of state interference with the free exercise of religion. It was decided in 1871 [*sic*], before judicial recognition of the coercive power of the Fourteenth Amendment to protect the limitations of the First Amendment against state action. It long antedated the 1938 decisions of *Erie R. Co.* v. *Tompkins* and *Ruhlin* v. *New York Life Ins. Co.,* 304 U. S. 64 and 202, and, therefore, even though federal jurisdiction in the case depended solely on diversity, the holding was based on general law rather than Kentucky law." *Kedroff* v. *St. Nicholas Cathedral,* 344 U. S. 94, 115–116 (1952).

lationship between church and state to permit civil courts to determine ecclesiastical questions. In language which has a clear constitutional ring, the Court said

"In this country the full and free right to entertain any religious belief, to practice any religious principle, and to teach any religious doctrine which does not violate the laws of morality and property, and which does not infringe personal rights, is conceded to all. The law knows no heresy, and is committed to the support of no dogma, the establishment of no sect. . . . All who unite themselves to such a body [the general church] do so with an implied consent to [its] government, and are bound to submit to it. But it would be a vain consent and would lead to the total subversion of such religious bodies, if any one aggrieved by one of their decisions could appeal to the secular courts and have them [*sic*] reversed. It is of the essence of these religious unions, and of their right to establish tribunals for the decision of questions arising among themselves, that those decisions should be binding in all cases of ecclesiastical cognizance, subject only to such appeals as the organism itself provides for." 13 Wall., at 728–729.[5]

---

[5] Accord, see, *e. g.*, decisions involving Presbyterian churches, *Trustees of Pencader Presbyterian Church* v. *Gibson,* 26 Del. Ch. 375, 22 A. 2d 782 (1941); *Bramlett* v. *Young,* 229 S. C. 519, 93 S. E. 2d 873 (1956); *St. John's Presbytery* v. *Central Presbyterian Church of St. Petersburg,* 102 So. 2d 714 (Fla. 1958); see also *Northside Bible Church* v. *Goodson,* 387 F. 2d 534 (C. A. 5th Cir. 1967). See generally for an examination of the development and growth of the rules for settling church property disputes, Note, Judicial Intervention in Disputes Over the Use of Church Property, 75 Harv. L. Rev. 1142 (1962); 54 Va. L. Rev. 1451 (1968); Duesenberg, Jurisdiction of Civil Courts Over Religious Issues, 20 Ohio St. L. J. 508 (1959); Comment, Judicial Intervention in Church Property Disputes— Some Constitutional Considerations, 74 Yale L. J. 1113 (1965).

The logic of this language leaves the civil courts *no* role in determining ecclesiastical questions in the process of resolving property disputes.

Later cases, however, also decided on nonconstitutional grounds, recognized that there might be some circumstances in which marginal civil court review of ecclesiastical determinations would be appropriate.[6] The scope of this review was delineated in *Gonzalez* v. *Archbishop,* 280 U. S. 1 (1929). There, Gonzalez claimed the right to be appointed to a chaplaincy in the Roman Catholic Church under a will which provided that a member of his family receive that appointment. The Roman Catholic Archbishop of Manila, Philippine Islands, refused to appoint Gonzalez on the ground that he did not satisfy the qualifications established by Canon Law for that office. Gonzalez brought suit in the Court of First Instance of Manila for a judgment directing the Archbishop, among other things, to appoint him chaplain. The trial court entered such an order, but the Supreme Court of the Philippine Islands reversed and "absolved the Archbishop from the complaint." This Court affirmed. Mr. Justice Brandeis, speaking for the Court, defined the civil court role in the following words: "In the absence of fraud, collusion, or arbitrariness, the decisions of the proper church tribunals on matters purely ecclesiastical, although affecting civil rights, are accepted in litigation before the secular courts as conclusive, because the parties in interest made them so by contract or otherwise." 280 U. S., at 16.

In *Kedroff* v. *St. Nicholas Cathedral,* 344 U. S. 94 (1952), the Court converted the principle of *Watson* as qualified by *Gonzalez* into a constitutional rule. *Kedroff* grew out of a dispute between the Moscow-based general Russian Orthodox Church and the Russian Orthodox

---

[6] See, *e. g., Bouldin* v. *Alexander,* 15 Wall. 131 (1872); *Brundage* v. *Deardorf,* 55 F. 839 (C. C. N. D. Ohio 1893).

churches located in North America over an appointment to St. Nicholas Cathedral in New York City. The North American churches declared their independence from the general church, and the New York Legislature enacted a statute recognizing their administrative autonomy. The New York courts sustained the constitutionality of the statute and held that the North American churches' elected hierarch had the right to use the cathedral. This Court reversed, finding that the Moscow church had not acknowledged the schism, and holding the statute unconstitutional. The Court said, 344 U. S., at 116:

> "The opinion [in *Watson* v. *Jones*] radiates . . . a spirit of freedom for religious organizations, an independence from secular control or manipulation— in short, power to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine. *Freedom to select the clergy, where no improper methods of choice are proven, we think, must now be said to have federal constitutional protection as a part of the free exercise of religion against state interference.*" (Italics supplied.)

And, speaking of the New York statute, the Court said further, *id.*, at 119:

> "By fiat it displaces one church administrator with another. It passes the control of matters strictly ecclesiastical from one church authority to another. *It thus intrudes for the benefit of one segment of a church the power of the state into the forbidden area of religious freedom contrary to the principles of the First Amendment.*" (Italics supplied.)

This holding invalidating legislative action was extended to judicial action in *Kreshik* v. *St. Nicholas Cathedral*, 363 U. S. 190 (1960), where the Court held that the constitutional guarantees of religious liberty required the

reversal of a judgment of the New York courts which transferred control of St. Nicholas Cathedral from the central governing authority of the Russian Orthodox Church to the independent Russian Church of America.

Thus, the First Amendment severely circumscribes the role that civil courts may play in resolving church property disputes. It is obvious, however, that not every civil court decision as to property claimed by a religious organization jeopardizes values protected by the First Amendment. Civil courts do not inhibit free exercise of religion merely by opening their doors to disputes involving church property. And there are neutral principles of law, developed for use in all property disputes, which can be applied without "establishing" churches to which property is awarded. But First Amendment values are plainly jeopardized when church property litigation is made to turn on the resolution by civil courts of controversies over religious doctrine and practice. If civil courts undertake to resolve such controversies in order to adjudicate the property dispute, the hazards are ever present of inhibiting the free development of religious doctrine and of implicating secular interests in matters of purely ecclesiastical concern. Because of these hazards, the First Amendment enjoins the employment of organs of government for essentially religious purposes, *Abington School District* v. *Schempp*, 374 U. S. 203 (1963); the Amendment therefore commands civil courts to decide church property disputes without resolving underlying controversies over religious doctrine. Hence, States, religious organizations, and individuals must structure relationships involving church property so as not to require the civil courts to resolve ecclesiastical questions.

The Georgia courts have violated the command of the First Amendment. The departure-from-doctrine element of the implied trust theory which they applied

requires the civil judiciary to determine whether actions of the general church constitute such a "substantial departure" from the tenets of faith and practice existing at the time of the local churches' affiliation that the trust in favor of the general church must be declared to have terminated. This determination has two parts. The civil court must first decide whether the challenged actions of the general church depart substantially from prior doctrine. In reaching such a decision, the court must of necessity make its own interpretation of the meaning of church doctrines. If the court should decide that a substantial departure has occurred, it must then go on to determine whether the issue on which the general church has departed holds a place of such importance in the traditional theology as to require that the trust be terminated. A civil court can make this determination only after assessing the relative significance to the religion of the tenets from which departure was found. Thus, the departure-from-doctrine element of the Georgia implied trust theory requires the civil court to determine matters at the very core of a religion—the interpretation of particular church doctrines and the importance of those doctrines to the religion. Plainly, the First Amendment forbids civil courts from playing such a role.

Since the Georgia courts on remand may undertake to determine whether petitioner is entitled to relief on its cross-claims, we find it appropriate to remark that the departure-from-doctrine element of Georgia's implied trust theory can play *no* role in any future judicial proceedings. The departure-from-doctrine approach is not susceptible of the marginal judicial involvement contemplated in *Gonzalez*.[7] Gonzalez' rights under a will

---

[7] We have no occasion in this case to define or discuss the precise limits of review for "fraud, collusion, or arbitrariness" within the meaning of *Gonzalez*.

turned on a church decision, the Archbishop's, as to church law, the qualifications for the chaplaincy. It was the archbishopric, not the civil courts, which had the task of analyzing and interpreting church law in order to determine the validity of Gonzalez' claim to a chaplaincy. Thus, the civil courts could adjudicate the rights under the will without interpreting or weighing church doctrine but simply by engaging in the narrowest kind of review of a specific church decision—*i. e.*, whether that decision resulted from fraud, collusion, or arbitrariness. Such review does not inject the civil courts into substantive ecclesiastical matters. In contrast, under Georgia's departure-from-doctrine approach, it is not possible for the civil courts to play so limited a role. Under this approach, property rights do not turn on a church decision as to church doctrine. The standard of departure-from-doctrine, though it calls for resolution of ecclesiastical questions, is a creation of state, not church, law. Nothing in the record suggests that this state standard has been interpreted and applied in a decision of the general church. Any decisions which have been made by the general church about the local churches' withdrawal have at most a tangential relationship to the state-fashioned departure-from-doctrine standard. A determination whether such decisions are fraudulent, collusive, or arbitrary would therefore not answer the questions posed by the state standard. To reach those questions would require the civil courts to engage in the forbidden process of interpreting and weighing church doctrine. Even if the general church had attempted to apply the state standard, the civil courts could not review and enforce the church decision without violating the Constitution. The First Amendment prohibits a State from employing religious organizations as an arm of the civil judiciary to perform the function of interpreting and applying state standards. See *Abington School District*

v. *Schempp, supra.* Thus, a civil court may no more review a church decision applying a state departure-from-doctrine standard than it may apply that standard itself.

The judgment of the Supreme Court of Georgia is reversed, and the case is remanded for further proceedings not inconsistent with this opinion.

*It is so ordered.*

Mr. JUSTICE HARLAN, concurring.

I am in entire agreement with the Court's rejection of the "departure-from-doctrine" approach taken by the Georgia courts, as that approach necessarily requires the civilian courts to weigh the significance and the meaning of disputed religious doctrine. I do not, however, read the Court's opinion to go further to hold that the Fourteenth Amendment forbids civilian courts from enforcing a deed or will which expressly and clearly lays down conditions limiting a religious organization's use of the property which is granted. If, for example, the donor expressly gives his church some money on the condition that the church never ordain a woman as a minister or elder, see *ante,* at 442, n. 1, or never amend certain specified articles of the Confession of Faith, he is entitled to his money back if the condition is not fulfilled. In such a case, the church should not be permitted to keep the property simply because church authorities have determined that the doctrinal innovation is justified by the faith's basic principles. Cf. *Watson* v. *Jones,* 13 Wall. 679, 722–724 (1872).

On this understanding, I join the Court's opinion.