Wanda Van GELDER, Elliott Hugh Simmons, George Louis Dines, Gerald William Vidlock, Clarence E. Koester, and Joni O. Johnson, Appellants,

v.

Bob LOOMIS, Don Grummer, Albert Otis, Bill Patchell, Lois Theimer, and Lela Ehrhart, Appellees.

No. 49647.

Supreme Court of Oklahoma.

Jan. 22, 1980.

___

Lee E. Witcher, Oklahoma City, for appellants.

Phillip F. Horning, Bulla, Horning & Johnson, Oklahoma City, for appellees.

BARNES, Justice:

This case involves a dispute over the synodical affiliation of Grace Evangelical Lutheran Church, located on Southwestern Street in Oklahoma City, Oklahoma. Since its incorporation in 1933, Grace Lutheran has been affiliated with the Missouri Synod of the Lutheran Church. In 1975, the voting members of the church congregation voted to terminate its affiliation with the Missouri Synod and to become affiliated with the Lutheran Church in Mission. The decision to change affiliations was not a unanimous one, and six members of those members of the congregation voting in the minority brought suit in the District Court of Oklahoma County on behalf of themselves and the entire minority group, which consisted of thirty-seven members of the congregation. The defendants in the suit were the Trustees of Grace Lutheran Church and the Church's Treasurer, the Trustees being in charge of the church's property, the Treasurer being in charge of the receipts of the special funds of the congregation. In the action brought in the District Court, the minority members of the congregation prayed for a temporary and permanent injunction, restraining the defendants from selling, mortgaging, pledging, or dissipating the real and personal property of Grace Lutheran Church, and additionally sought to have the defendants specifically enjoined from making any synodical contributions or pledges.

The thrust of the minority's complaint was that election procedure followed in the election to change synodical affiliation did

not comply with the provisions of the Constitution of Grace Lutheran for two basic reasons:

1. Doctrinal positions of Grace Lutheran Church, which were contra to doctrinal positions embraced by the new synod which the congregation sought to be affiliated with, created a "doctrinal question" which, under the provisions of Article VII of Grace Lutheran's Constitution, were "matters decided by the Word of God" and could not be submitted to the vote of the congregation.

2. Even if the matter was one which could be submitted to the vote of the congregation, the election, and its subsequent ratification, were not conducted in compliance with specific provisions of the Constitution, thus making the election invalid.

## I.

We will first determine whether the election procedures followed complied with the Church's Constitution. The minority members of the congregation make five separate complaints with respect to the procedure followed before and during the election and ratification procedure.

First, the minority complains that they were not invited to meetings held by different members of the congregation at which a change in synodical affiliations was discussed. In addressing this complaint, we would note that none of the meetings involved were formal or official meetings of the church or any of its boards, and that the meetings were convened by members of the congregation in favor of an affiliation change, in order to promote support for such change. Whether or not members of the minority were systematically not invited to these meetings is difficult to determine, but we need not make such determination, as there is no requirement in the Constitution that all members must be invited.

 Secondly, the minority complains that at the meeting in which the initial vote was taken, errors were made in reinstating voting memberships to members, and in conferring voting membership upon approximately sixty new members. The provisions of the Church Constitution provide for admittance of such members, and no evidence was introduced to show that the procedures outlined in the Constitution were not followed. Therefore, we cannot say that the procedures followed were irregular.

 Thirdly, the minority complains that a free and open discussion of affiliation change was prohibited at the meeting. In addressing this issue, we would note that at the meeting in which the election was held, and prior to the election, a motion to limit discussion on all motions presented at the meeting to one and one-half minutes for each speaker was made, seconded, and passed. Such motions to limit debate are permissible under normal parliamentary procedure, and we see no irregularity in such a motion, particularly in light of the fact that regular bi-monthly meetings, such as the one in question, were, by prior vote of the congregation, limited to a total length of two hours. As the synodical affiliation issue was one which would generate much comment, it would seem that the only way to conduct the discussion and keep the meeting within prior limits was to limit the discussion time. Accordingly, we find that the motion to limit discussion did not constitute an irregularity.

Fourthly, the minority complains that the election should not have been conducted by secret ballot. However, the minority is unable to support its claim by pointing to any constitutional or by-law provisions which would preclude the use of secret ballot at bi-monthly voters' meetings. Accordingly, we find no merit to the minority's complaint.

 Lastly, the minority complains that the notice given of the ratification vote was not adequate. Article VII of the Church Constitution provides that regular bi-monthly meetings are to be held on the first Sunday in October and on the first Tuesday in December. That same Article also provides:

"Every voters' meeting shall be announced orally *or* by means of a bulletin at a Sunday public service previous to the meeting, *or* be brought to the attention of every voter by mail or telephone. Meetings so announced shall be valid and legal, provided that at least one-third of the voters not having a standing excuse are in attendance (quorum)." [Emphasis added]

When the issue of synodical affiliation was first considered in October, notice of the meeting, and notice of the issue to be voted upon, was announced orally, and by means of church bulletins, and by mailed notice to every voting member. The minority does not complain of the notice involved with this October 5th meeting. However, Section V of Article VII of the Church Constitution provides in part that:

"Very important resolutions not requiring immediate action should not be considered final *until they have been ratified at a subsequent meeting.*" [Emphasis added]

Notice of the ratification vote was announced in church, and the church bulletin announced that a bi-monthly meeting would be held on the first Tuesday in December, though the bulletin did not indicate what issues would be considered. The minority argues that the notice in the bulletin was not sufficient, as it did not indicate the issue to be considered.

We find no merit to the minority's contentions for the following reasons: The above quoted provisions of the Constitution merely mandate that notice of the voters' meeting be given; nowhere does the Constitution require that an agenda or list of issues be provided. Additionally, the above quoted provisions require only one type of notice. Note that the Constitution provides for notice by oral announcement, *or* by means of a bulletin, *or* by mail or telephone. By using the disjunctive "or", drafters of the Church Constitution provided that any one of the three alternative methods of notice would be sufficient. As such notice was given, we find that the constitutional requirements were complied with.

Additionally, the minority argues, by inference, that even if the constitutional requirements were met, they were still not afforded proper notice, as oral notice given at the Sunday service prior to the ratification vote was not sufficient to apprise them of the upcoming election, as members of the majority were well aware that the minority had, after the initial election, ceased participating in Sunday services. We do not think members of the minority can complain because of their own absence. The Constitution clearly provided that oral announcement is sufficient, and also clearly provided when bi-monthly meetings would be held, and that important matters, not needing immediate action, would be ratified at subsequent meetings. These facts, coupled with the announcement of the bi-monthly meeting in the church bulletin, should have been sufficient to apprise members of the minority of the meeting. Indeed, defendants' Exhibit Three, the minutes of the December 2nd bi-monthly meeting, at which the synodical change was ratified, indicates that all six of the named plaintiffs (Appellants) in the case before us attended the meeting, and that thirty-seven members of the minority attended the ratification meeting and voiced their objections.

This being the case, we find no merit to the minority's objection to notice.

### II.

Next, we consider the minority's argument that Article VII, Section V, of the Church Constitution, prohibited the submission of the resolution seeking affiliation with the Mission Synod, because that question is a "matter decided by the Word of God", which, under the above cited constitutional provision, may not be submitted to the vote of the congregation. The trial court abstained from addressing this issue, holding that it was a doctrinal decision, which, because of First Amendment restriction, was a matter to be resolved within the religious body, and not in civil courts. In *Presbyterian Church in United States v. Mary Blue Hull Memorial Presbyterian Church, 393 U.S. 440, 89 S.Ct. 601, 21*

*L.Ed.2d 658 (1969),* the United States Supreme Court stated:

"Thus, the First Amendment severely circumscribes the role that the civil courts may play in resolving church property disputes. It is obvious, however, that not every civil court decision as to property claimed by a religious organization jeopardizes values protected by the First Amendment. Civil courts do not inhibit free exercise of religion merely by opening their doors to disputes involving church property. And there are neutral principles of law, developed for use in all property disputes, which can be applied without 'establishing' churches to which property is awarded. *But First Amendment values are plainly jeopardized when church property litigation is made to turn on the resolution by civil courts of controversies over religious doctrine and practice.* If civil courts undertake to resolve such controversies in order to adjudicate the property dispute, the hazards are ever present of inhibiting the free development of religious doctrine and of implicating secular interests in matters of purely ecclesiastical concern. Because of these hazards, the First Amendment enjoins the employment of organs of government for essentially religious purposes, . . .; the Amendment therefore commands civil courts to decide church property disputes without resolving underlying controversies over religious doctrine. Hence, States, religious organizations, and individuals must structure relationships involving church property so as not to require the civil courts to resolve ecclesiastical questions." [Emphasis added]

In the *Presbyterian Church-Hull case,* the Georgia trial court was called upon to determine whether the general church had departed from its tenets of faith and practice. The trial court rejected motions to dismiss which asserted the position that the civil court, under the free exercise clause of the First Amendment, was without power to determine whether the general church had departed from its tenets of faith and practice. That court denied the motion and submitted the case to the jury on the theory that Georgia law applies a trust of local church property for the benefit of the general church on the sole condition that the general church adhere to its tenets of faith and practice existing at the time of the affiliation by the local churches. Thus, the jury was instructed to determine whether the action of the general church amounted to a fundamental or substantial abandonment of the original tenets and doctrine of the general church, so that the new tenets and doctrines are utterly variant from the purpose for which the general church was founded.

The jury returned a verdict for the local church, and the Georgia Supreme Court affirmed.

In reversing the action of the State courts, the United States Supreme Court held that the departure-from-doctrine element of the implied trust theory which the State courts applied required the civil courts to determine whether actions of the general church constituted a substantial departure from the tenets of faith and practices which existed at the time of the local church affiliation. The United States Supreme Court held that consideration of such an issue was plainly forbidden by the free exercise clause of the First Amendment to the United States Constitution, stating:

". . . A civil court can make this determination only after assessing the relative significance to the religion of the tenets from which departure was found. Thus, the departure-from-doctrine element of the Georgia implied trust theory requires the civil court to determine matters at the very core of a religion—the interpretation of particular church doctrines and the importance of those doctrines to the religion. Plainly, the First Amendment forbids civil courts from playing such a role."

In the case before us, the minority argues that a decision to affiliate with the Mission Synod would constitute a substantial departure from church doctrine, and therefore was a matter under the Church Constitu-

tion which could *not* be submitted to the vote of the congregation.

Under the authority of the *Presbyterian Church case, supra,* we hold that the trial court acted properly in holding that the free exercise clause of the First Amendment prohibits it from considering the church doctrinal issues which the minority members of the congregation sought to raise in the trial court. Also, see *Oklahoma District Council of Assemblies of God v. New Hope Assembly of God Church, Okl., 548 P.2d 1029 (1976).*

For the above stated reasons, we affirm the action of the trial court.

AFFIRMED.

All the Justices concur.