Mirko MARICH, Elija Dukich, Ellia Zukanovich, Stevo Mileusnich, Rade Radakovich, Elija Popovich, Drago Vukas, Elija Kalinich, Marko Kosovac, Vojin Blesich, Vukman Martinovich, Sveto Torbica, Nick Bradash, Mike Bradash, Kosta Trkulja, Veso Kesich, Appellants (Plaintiffs Below),

v.

Nicholas KRAGULAC, Sam Zivanovic, Dusan Grozdanich, Olga Parsinari, Bogoljub Markovich, Nick Stepanovich, Milenko Zivanovic and Peter Tumbas, as Officials of the Serbian Orthodox Church-School Congregation of the Great Martyr St. George in East Chicago, Indiana, and V. Rev. John Marcetich, Pastor of the Serbian Orthodox Church-School Congregation of the Great Martyr St. George in East Chicago, Indiana, Appellees (Defendants Below).

No. 3-179A21.

Court of Appeals of Indiana, Third District.

Jan. 27, 1981.

Rehearing Denied March 4, 1981.

Martin A. Karr, East Chicago, Charles W. Ainlay, George E. Buckingham, Goshen, for appellants.

David P. Stanton, Gary, Nick T. Stepanovich, David S. Stevens, East Chicago, for appellees.

HOFFMAN, Presiding Judge.

This is an appeal from an action to determine the rights of plaintiffs-appellants Mirko Marich et al. and defendants-appellees Nicholas Kragulac et al. to possession and control of the property of the Serbian Orthodox Church-School Congregation of the Great Martyr St. George in East Chicago, Indiana (St. George). The trial court dismissed the suit, ruling that it lacked subject-matter jurisdiction under the free exercise of religion clause of the First Amendment.

To comprehend the contentions of the parties and the disposition of the cause by the court below it is essential to examine the factual background of the case at some length. On August 21, 1907 fourteen individuals of Serbian extraction formed the Serbian Lodge Elijah in Indiana Harbor, Indiana. The lodge held periodic religious services at a hall in East Chicago and selected a Serbian Orthodox priest to serve as its pastor. On October 30, 1911 the members formed a congregation under the name "Serbian Orthodox Church of St. George." From its inception the parishioners have adhered to the doctrines, dogmas and tenets of the Serbian Orthodox religion.

By October 22, 1912 the St. George congregation had obtained title to several lots upon which the property in question is situated. The deed runs to the "Servian [sic]. Orthodox Church of St. George of Indiana Harbor, in the State of Indiana" and restricts use of the property for 20 years to a residence or for church purposes.

In 1927 the Serbian Orthodox Diocese in the United States and Canada was created and the St. George congregation voluntarily entered into an ecclesiastical association with it. The Diocese as then constituted comprised the entire territory of the United States and Canada and was one of the dioceses of the Mother Church in Belgrade, Yugoslavia. The spiritual head of the Mother Church was the Serbian Patriarch and the power of appointment of bishops was vested in the Holy Assembly of Bishops. Prior to May 10, 1963, Bishop Dionisije was designated as Bishop of the United States and Canada Diocese. On that date the Holy Assembly, with the support of the Patriarch, divided the United States and Canada Diocese into three new dioceses. New bishops were appointed in each of these dioceses. Bishop Dionisije opposed this division on the grounds that the decision was dictated by a National Religious Commission appointed by President Tito and the Communist Party in Yugoslavia. Dionisije was subsequently defrocked on March 15, 1964. Basically, plaintiffs are loyal to the Mother Church and desire to retain an affiliation therewith while defendants are supporters of Dionisije in the local church.

As a result of this rift plaintiffs withdrew from the St. George congregation and organized another church under the same name. They purchased property of their own and built a church hall thereon. Additionally they developed plans and specifications for a new church on these grounds.

In 1965 plaintiffs filed a complaint for declaratory and injunctive relief. The prayer for relief illustrates the nature of this lawsuit. It states:

"WHEREFORE, the plaintiffs pray:

A. Plaintiffs pray for a declaratory judgment under Sections 3–1101 to 3–1116 of the Burns Indiana Statutes declaring that Chapter 117, of the Acts of 1955, of the General Assembly of the State of Indiana, is applicable to the defendants herein, and that they be restrained and enjoined from doing, or attempting to do, the acts hereinafter more fully set out.

B. That the defendants, individually, jointly or in concert, directly or indirectly, or their successors, agents, servants or followers, be prohibited from admitting or accepting, illegally and unlawfully, into membership, persons who formerly lost membership under the By-Laws of said religious society from the failure to pay dues.

C. That the defendants, individually, jointly, or in concert, directly or indirectly, or their successors, agents, servants or followers, be temporarily and permanently enjoined from calling a meeting for a vote on an issue which is an issue not to be voted upon.

D. That the defendants, individually, jointly or in concert, directly or indirectly, or their successors, agents, servants or followers, be temporarily and permanently enjoined from attempting by diverse ways and means, falsely, unlawfully and wrongfully to perfect the schismatic minority movement locally under the guise of the so-called voting issue and under the guise of the so-called 'free election' by:

1. Bringing into membership persons who previously lost their membership due to their failure to pay due [sic], and persons living in localities outside of the jurisdiction of the said religious society.

2. Disseminating false, untrue and intimidating propaganda in order to influence prospective voters under the so-called 'free election.'

3. By the confiscation of books of records, from the proper and duly elected officers.

4. By performing illegally and unlawfully duties and functions of officers, without right, consent or privilege.

5. Drawing up and proposing to use deceiving ballots during packed house 'free election' on an issue which is not a votable [sic] issue.

E. That the defendants, individually, jointly, or in concert, directly or indirectly, or their successors, agents, servants or followers, be temporarily and permanently required to cease, desist immediately from illegally and unlawfully performing duties and functions of proper and duly elected officers of said society, without their knowledge, right, consent or privilege.

F. That the defendants, individually, jointly or in concert, directly or indirectly, or their successors, agents, servants or followers, be enjoined to return books of records wrongfully and illegally confiscated from proper and duly elected officers of said religious society.

G. That the defendants, individually, jointly or in concert, directly or indirectly, or their successors, agents, servants or followers, be temporarily and permanently enjoined from holding monthly or yearly meetings composed of a 'packed house membership' in order to perfect the advancement of their schismatic minority movement, and to insure further their positions in office by permitting the aforesaid 'packed house membership' to vote.

H. That the defendants, individually, jointly or in concert, directly or indirectly, or their successors, agents, servants or followers, be temporarily and permanently enjoined from calling, setting or proposing to conduct or hold an annual meeting of the said religious society in any other month than the month of December.

I. That the defendants, individually, jointly or in concert, directly or indirectly, or their successors, agents, servants or followers, be temporarily and permanently enjoined from making any donations or expenditures from the religious society's funds to organizations or causes which are unpopular and in violation or in opposition to the true intention and trust of the religious society.

J. That the defendants, individually, jointly or in concert, directly or indirectly, or their successors, agents, servants or followers, be temporarily and permanently enjoined from permitting the V. REV. JOHN MARCETICH to officiate in the Holy Altar of the Serbian Eastern Orthodox Church-School Congregation of the Great Martyr St. George in East Chicago, Indiana, while he is under canonical suspension by the proper, superior and higher ecclesiastical church authorities.

K. That the defendants, individually, jointly or in concert, directly or indirectly, or their successors, agents, servants or followers, be temporarily and permanently enjointed [sic] from paying the V. REV. JOHN MARCETICH, who is under suspension (canonical), the full salary in direct violation of the Constitution of the Diocese, and of the Serbian Orthodox Church, and that he be paid only one-half (½) of his salary during the pendency of the suspension.

L. That the defendants, individually, jointly or in concert, directly or indirectly, or their successors, agents, servants or followers, be temporarily and permanently enjointed [sic] from prohibiting the proper administration of religious canonical services to the faithful of the religious society and church, by clergymen who have been proscribed by the presiding bishop, RT. REV. BISHOP FIRMILIAN OCOKOLICH.

M. That the defendants, individually, jointly or in concert, directly or indirectly, or their successors, agents, servants or followers, be temporarily and permanently enjointed [sic] from selling, mortgaging, or in any way encumbering the properties, monies or temporalities of said religious society, in violation of the By-Laws of the said religious society was created, and in violation of the Constitutions of the Diocese and the Serbian Orthodox Church.

N. That the defendants, individually, jointly or in concert, directly or indirectly, or their successors, agents, servants or followers, be temporarily and permanently enjoined from engaging in any schismatic movement or in the alternative be removed from office and, further, that:

a) An immediate audit of all funds, monies and records be directed.

b) That they be required to restore all monies or funds to the proper accounts.

c) That they be surcharged for any loss, damage or injury to the said religious society as a result of their acts.

O. That the properties, monies, assets and temporalities of the religious society be declared to be held in trust, and used only within and for that purpose or trust for which it was created, originally organized and perpetuated.

P. That all those who have participated in the past, and in the present in the schismatic minority movement, and those who are followers of the aforesaid schismatic minority movement, be found by their voluntary act to have severed their ties, relationship and membership with the religious society, and that they henceforth be enjoined, individually, jointly or in concert, directly or indirectly, by themselves, through their agents, servants or followers, from any further interference, harassment with the said religious society and any rights, duties or obligations which they previously had to said religious society are henceforth severed and terminated.

Q. That only those members of the religious society in good standing and those who have adhered to and continued to recognize the authority of the superior and higher ecclesiastical church authority, and who adhere to the faith, doctrines, dogma, rules, regulations and the decisions of the Serbian Patriarchate be recognized and declared as the sole members of the said religious society, they having continued to support, affirm and perpetuate the original trust for which said religious society was originated, created and founded.

R. That the court direct that a meeting be called immediately of the duly constituted membership, composed of those faithful adherence [sic] of the Serbian Patriarchate-Mother Church, who have remained and continued their faithful compliance and obedience to the Serbian Patriarchate-Mother Church, the superior and higher ecclesiastical church authority, in accordance with the trust which said church was originated, created and founded, and that new officials of said religious society be elected and directed to conduct, manage and perpetuate the Serbian Eastern Orthodox Church-School Congregation of the Great Martyr St. George, in East Chicago, Indiana, in full compliance with the said trust which the church was originated, created and founded, and perpetuated and in full compliance with the By-Laws of the religious society and, further, in compliance with the Constitutions of the Diocese and the Serbian Orthodox Church.

S. And that a hearing on the temporary injunction be held on the 7th day of May, 1965, at 10:00 A.M. and for all other just and proper relief in the premises."

In 1977 plaintiffs moved, without supporting affidavits, for summary judgment. Defendants filed affidavits in response thereto and also moved to dismiss the cause because, *inter alia*, the trial court lacked subject-matter jurisdiction. The trial court denied the motion for summary judgment but dismissed the cause. It is this order of dismissal which gives rise to the instant appeal.

One argument permeating plaintiffs' brief is that the trial court erroneously equated subject-matter jurisdiction with the limited standard of review imposed on the courts by the First Amendment. They reason that inasmuch as the Starke Circuit Court was empowered to determine title to

real estate it possessed subject-matter jurisdiction to adjudicate the instant dispute. Thus, it is urged, the trial court erred in dismissing the suit.

■■■ While the simple logic of this proposition has surface appeal it nonetheless must be rejected. Undoubtedly the State has a legitimate interest in the peaceful resolution of property disputes and in providing a civil forum where the ownership of church property can be determined conclusively. *Jones v. Wolf* (1979), 443 U.S. 595, 99 S.Ct. 3020, 61 L.Ed.2d 775. It is also true that the source of the controversy, i. e., whether the property dispute is motivated by a controversy over doctrinal practices, is not determinative of whether the civil courts can intervene to decide church property disputes. To so hold would too narrowly restrict the scope of the court's jurisdiction. *Merryman v. Price* (1970), 147 Ind. App. 295, 259 N.E.2d 883.

■■■ Nevertheless the free exercise of religion clause contained in the First Amendment does circumscribe the *power* of civil courts to entertain litigation involving church property. As a direct outgrowth of that clause it has been decided that the relevant inquiry must be whether the court can resolve the property dispute on the basis of neutral principles of law which do not involve the resolution by the court of ecclesiastical issues. *Presbyterian Church v. Hull Church* (1969) 393 U.S. 440, 89 S.Ct. 601, 21 L.Ed.2d 658; *Draskovich et al. v. Pasalich et al.* (1972), 151 Ind.App. 397, 280 N.E.2d 69. If the court must resolve questions of doctrinal propriety in order to determine who has legal control of the property, then it has no jurisdiction of the purported cause of action.

Illustrative in this regard is *Hull Church*. There the Georgia trial court was called upon to decide whether the general church had departed from its tenets of faith and practice. The trial court rejected motions to dismiss which asserted the position that the civil court, under the free exercise clause of the First Amendment, was without power to determine if the general church had departed from its doctrine. The case was submitted to the jury on the theory that Georgia law implies a trust of local church property for the benefit of the general church on the sole condition that the general church adhere to its tenets of faith and practice existing at the time of the affiliation by the local churches. Thus the jury was instructed to determine whether the actions of the general church amounted to a fundamental or substantial abandonment of the original tenets and doctrine of the general church so that the new tenets and doctrines were utterly variant from the purpose for which the general church was founded. The jury returned a verdict for the local church and the Georgia Supreme Court affirmed.

In reversing the action of the state courts the United States Supreme Court held that the departure-from-doctrine element of the implied trust theory which the state courts applied required the civil courts to determine whether the actions of the general church constituted a substantial departure from the tenets of faith and practices which existed at the time of the local church affiliation. The Supreme Court held that consideration of such an issue was forbidden by the First Amendment, stating:

"Thus, the First Amendment severely circumscribes the role that civil courts may play in resolving church property disputes. It is obvious, however, that not every civil court decision as to property claimed by a religious organization jeopardizes values protected by the First Amendment. Civil courts do not inhibit free exercise of religion merely by opening their doors to disputes involving church property. And there are neutral principles of law, developed for use in all property disputes, which can be applied without 'establishing' churches to which property is awarded. But First Amendment values are plainly jeopardized when church property litigation is made to turn on the resolution by civil courts of controversies over religious doctrine and practice. If civil courts undertake to resolve such controversies in order to adjudicate the property dispute, the hazards are ever

present of inhibiting the free development of religious doctrine and of implicating secular interests in matters of purely ecclesiastical concern. Because of these hazards, the First Amendment enjoins the employment of organs of government for essentially religious purposes, *School District of Township of Abington, Pa. v. Schempp*, 374 U.S. 203, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963); the Amendment therefore commands civil courts to decide church property disputes without resolving underlying controversies over religious doctrine. Hence, States, religious organizations, and individuals must structure relationships involving church property so as not to require the civil courts to resolve ecclesiastical questions.

"The Georgia courts have violated the command of the First Amendment. The departure-from-doctrine element of the implied trust theory which they applied requires the civil judiciary to determine whether actions of the general church constitute such a 'substantial departure' from the tenets of faith and practice existing at the time of the local churches' affiliation that the trust in favor of the general church must be declared to have terminated. This determination has two parts. The civil court must first decide whether the challenged actions of the general church depart substantially from prior doctrine. In reaching such a decision, the court must of necessity make its own interpretation of the meaning of church doctrines. If the court should decide that a substantial departure has occurred, it must then go on to determine whether the issue on which the general church has departed holds a place of such importance in the traditional theology as to require that the trust be terminated. A civil court can make this determination only after assessing the relative significance to the religion of the tenets from which departure was found. Thus, the departure-from-doctrine element of the Georgia implied trust theory requires the civil court to determine matters at the very core of a religion—the interpreta-

tion of particular church doctrines and the importance of those doctrines to the religion. Plainly, the First Amendment forbids civil courts from playing such a role."

393 U.S. at 449–450, 89 S.Ct. at 606.

A host of decisions applying *Hull Church* have also recognized the jurisdictional element of the First Amendment's prohibition against civil courts undertaking to resolve controversies over religious doctrine and practice. *See: Wilson v. Hinkle* (1977) 67 Cal.App.3d 506, 136 Cal.Rptr. 731 (superior court was without jurisdiction in a case brought by a former minister and certain members of the church against the present minister, several members and the church corporation for the return of church property on the grounds that defendants had departed from former church doctrine); *Pfeifer v. Christian Science Com. on Pub. for Ill.* (1975) 31 Ill.App.3d 845, 334 N.E.2d 876 (in an action by a church member to stop the practice of Christian Science in Illinois until it could be shown to be in accordance with church by-laws and to stop church publications from being distributed until it could be shown that they intended to conform to the church manual, it was held that trial court lacked jurisdiction to make factual determinations as to whether particular teachings were in conformity with those of the founder of the church); *Gelder v. Loomis* (1980) Okl., 605 P.2d 1330 (free exercise clause of First Amendment prohibited the trial court from considering whether the congregation's decision to affiliate with another synod constituted a substantial departure from church doctrine and therefore under church constitution was a matter which could not be submitted to the vote of the congregation; accordingly prayer for injunction to enjoin defendants from selling, conveying or dissipating church property denied); *Parker v. Kilgore* (1978) Tex.Civ.App., 561 S.W.2d 624 (trial court lacked jurisdiction to find that certain doctrinal restrictions as to the teachings and type of worship to be permitted on church property were void).

■ That the bulk of plaintiffs' cause of action would invariably embroil the trial court in an ecclesiastical thicket becomes apparent by examining the underlying facts of the suit and the relief requested. It is urged that plaintiffs are entitled to the church property because they, unlike defendants, recognize the validity of the Mother Church's decisions to abolish the American-Canadian diocese and to defrock Bishop Dionisije. In essence plaintiffs are asking the trial court to determine that defendants, by virtue of their claim of ecclesiastical autonomy, have performed schismatic acts amounting to a withdrawal from the Mother Church. The gist of this request is that defendants have acted contrary to the doctrine and tenets of the church. Considering the doctrinal issues which plaintiffs sought to raise, the trial court did not have jurisdiction over this segment of the case to grant or deny the relief requested and its only proper action was a dismissal thereof.

Notwithstanding the foregoing, plaintiffs suggest that the trial court did possess jurisdiction over another phase of the case. Specifically they insist that the trial court could determine, on the basis of neutral principles of law, that St. George was part of a hierarchical polity and therefore plaintiffs, as adherents to the Mother Church, were entitled to possession of the church property.

The modern view of the law relating to church property disputes attaches substantial significance to the internal structure or polity of the congregation and the parent church. *Watson v. Jones* (1871) 80 U.S. (13 Wall.) 679, 20 L.Ed. 666; *Kedroff v. St. Nicholas Cathedral* (1952) 344 U.S. 94, 73 S.Ct. 143, 97 L.Ed. 120. This view has evolved in response to admonitions gleaned from the First Amendment prohibiting civil courts from resolving church property disputes on the basis of religious doctrine and practice and requiring that the courts defer to the resolution of issues of religious doctrine or polity by the highest court of a hierarchical church organization. *Serbian Orthodox Diocese v. Milivojevich* (1976) 426 U.S. 696, 96 S.Ct. 2372, 49 L.Ed.2d 151.

"Subject to these limitations, however, the First Amendment does not dictate that a State must follow a particular method of resolving church property disputes. Indeed, 'a State may adopt *any* one of various approaches for settling church property disputes so long as it involves no consideration of doctrinal matters, whether the ritual and liturgy of worship or the tenets of faith.' *Md. & Va. Churches*, 396 U.S. [367], at 368, 90 S.Ct. [499], at 500. (BRENNAN, J., concurring) (emphasis in original)."
*Jones v. Wolf, supra*, 443 U.S. at 602, 99 S.Ct. at 3025.

■ The polity approach is not, however, one of mechanical simplicity. Rather it entails three stages of analysis. In the first step it must be determined whether the denomination is, in general, hierarchical or congregational. If the denomination is found to be hierarchical, the inquiry turns to whether the local congregation is in fact subject to the direction of the hierarchy. Should an affirmative determination be made in this regard, the court must then ascertain the legitimate source of authority in the hierarchy and enforce its decisions. See *Judicial Intervention in Disputes Over the Use of Church Property*, 75 Harv.L.Rev. 1142, 1158 (1962) for an extensive analysis of the polity approach.

The polity approach was applied in *Draskovich et al. v. Pasalich et al., supra*, 151 Ind.App. 397, 280 N.E.2d 69. There the plaintiffs, who were followers of the Bishop Dionisije, sued for injunctive relief to prohibit the defendants from exercising control and ownership of local church property. The trial court granted the injunction and defendants appealed. The Court of Appeals reversed, holding that where the documentary evidence disclosed that the local church has organized as a church within the hierarchy of the Mother Church, those who remained loyal to the Mother Church were entitled to control and use of the property and the trial court transgressed the First Amendment in deciding that the Mother Church's act in dividing the United States and Canada dioceses was null and void.

Defendants distinguish *Draskovich* from the case at bar stressing that in the present situation it appears St. George and the Diocese agreed that the former would not be subject to hierarchical control. To underscore this distinction they rely on the uncontroverted affidavit of Nick Stepanovich, legal advisor to the St. George congregation, which averred in part:

"He is acquainted with the history of said Saint George Serbian Orthodox Church School Congregation from its beginning. The congregation is 70 years old. Since 1930, Affiant has actively participated in its affairs. The Church started on August 21, 1907, when Fourteen individuals of Serbian extraction formed the Serbian Lodge Elijah, in Indiana Harbor, Indiana. They elected one Lazar Saric as the first President. They intermittently held services in a small hall at 3438 Pennsylvania Avenue, East Chicago, Indiana. They called upon Reverend Vojvodich, a Serbian Orthodox Priest from Chicago, Illinois.

"On October 30, 1911, they formed a congregation under the name Serbian Orthodox Church of St. George. (This was 8 years before the Serbian Orthodox Church, under the Patriarch was even established in Belgrade (1919), and 16 years before the creation of the Serbian Orthodox Diocese in the United States and Canada (1927).

"At the meeting formalizing the congregation, they elected Rt. Rev. Joanikija Markovich, as their Priest, who at that time was the Priest at a Pittsburg Serbian Orthodox Church, from the beginning of the Church they have elected 20 Priests.

"They elected a President, Vice-President, Treasurer and three Trustees. The Church officers then set about acquiring real property, and planning a Church.

"On October 22, 1912, they obtained title to five of the six lots upon which the present buildings were constructed.

"The Deed runs to 'Servian [sic] Orthodox Church of Saint George of Indiana Harbor, in the State of Indiana.'

"The Deed restricts the use of the property for 20 years to 'a residence or for Church purposes.'

"The congregation grew. From its inception to the present, the Church and parishioners were committed to and practiced the doctrines, dogmas and tenets of the Serbian Orthodox religion, until 1927, they were served by Serbian Priests they selected from among the Russian Orthodox Jurisdiction, in the United States.

"From its beginning, in 1911, the Church was congregational in nature. It had no connection with any Church hierarchy. It had its own property. It elected its own priests. It was completely independent and autonomous.

"The Deed to the original Church contains no description of the term 'Church purposes' to which the use was restricted, but as the grantee is named 'Servian [sic] Orthodox Church,' it is obvious that an express trust was created that the property be used for the Orthodox religion.

"Equally, a trust was impressed upon the property, that the Church remain as it then was, congregational and independent, rather than hierarchal [sic].

"Prior to 1927, there was in the United States, no nationally organized Serbian Orthodox religious organizations. In that year there came into being an organization named THE SERBIAN ORTHODOX DIOCESE IN THE UNITED STATES AND CANADA, with headquarters in Libertyville, Illinois.

"In 1927, the East Chicago Congregation voluntarily entered into an ecclesiastical association with the said United States Orthodox Diocese in the United States and Canada.

"But, in so joining, through the mutual acceptance of their By-Laws by the Diocese, and the Constitutional provisions of the Diocese, by them, they were careful to preserve their independent, autonomous congregational character. They made no change in their religion. They remained in the Orthodox Faith. But they surrendered no independence.

"In the first place no provision prohibiting subsequent withdrawal was included

in the joinder. There was nothing irrevocable in the action of joining. They retained, therefore, the same right to withdraw as the right to join.

"Secondly, they saw to it, through mutual agreements, that their Church property would not be impressed with any hierarchal [sic] control, as indicated by these By-Laws:

CHURCH SCHOOL PROPERTY

ARTICLE 88

All properties and assets of the Saint George Serbian Orthodox Church-School Congregation shall be considered under this article.

ARTICLE 89

The assets of the church-school congregation belong exclusively to this congregation and the diocese has no right to our properties.

The Diocese Council has the right to supervise only if two-thirds of regular members present ask for such supervision.

ARTICLE 92

The real estate owned by the Congregation is registered in the recorder's office in the name and ownership of this congregation.

"They saw to it that these reservations of property rights were acknowledged and agreed to by the Diocese in these provisions of the Diocese Constitution:

'DIOCESAN PROPERTY

Paragraph 146

Under the name of the Diocesan Property are understood such properties which constitute the Diocesan ownership; under the name of the Parish Property are understood the properties which constitute the Church-School Parish ownership.

Paragraph 147

The property of the Church-School parishes in certain colonies belongs exclusively to the respective parishes, to which the Diocese has no rights....'

"Thirdly, and most important of all, preserving their congregational character, they retained for themselves that factor which most differentiates a congregational from an hierarchal [sic] church, namely the right to control over the selection, discharge and duties of the Priest. In their By-Laws, they retained in this regard, the same rights, after joining the Diocese, as they had before."

■ Were it possible to base our decision solely on the foregoing affidavit defendants would prevail for the following reasons. When any party has moved for summary judgment, the court may grant summary judgment for any other party upon the issues raised by the motion although no motion for summary judgment was filed by such party. Ind. Rules of Procedure, Trial Rule 56(B). Therefore in light of the uncontradicted affidavit of Stepanovich the trial court should have found, had it properly exercised subject-matter jurisdiction over this segment of the lawsuit, that the local church and its property was not subject to hierarchical control as a matter of law. Since plaintiffs moved for summary judgment upon these matters the trial court should have ruled that the issue of hierarchical control over the disputed property presented no bar to entry of summary judgment in favor of defendants.

■ However this affidavit is insufficient to serve as a basis for summary judgment. The law is well settled that if a document is relied upon to support a motion for summary judgment, it must be exhibited in full; affidavits as to its substance, effect or interpretation are not sufficient. *Lukacs v. Kluessner* (1972), 154 Ind.App. 452, 290 N.E.2d 125. Insofar as no copies of the deed, by-laws or church constitution were submitted to the trial court in opposition to plaintiffs' motion, the Stepanovich affidavit fits squarely within the rule laid down in *Lukacs.* Accordingly this aspect of the lawsuit must be remanded so that the parties may litigate the question of hierarchical control.

If the trial court finds, on the basis of neutral principles of law, that the relationship between the local church, the Diocese and the Mother Church was based on an hierarchical structure then plaintiffs would be entitled to possession of the property in question.[1] Otherwise it belongs to the St. George congregation. Of course, a finding that control over the local church property was vested in the St. George congregation would not terminate the controversy for in local schism cases it is necessary to identify which faction represents the local congregation. On this point *Jones v. Wolf, supra*, offers guidance.

There the property of the local church was held in the names of the local church or of the trustees for the local church. This church, however, was established as a member of the Augusta-Macon Presbytery of the Presbyterian Church in the United States (PCUS) which has a generally hierarchical form of government. Under the polity of the PCUS the government of the local church is committed to its Session in the first instance, but the actions of this assembly or "court" are subject to the review and control of the higher church courts, the Presbytery, Synod and General Assembly, respectively.

At a congregational meeting attended by a quorum of the local church's members, 164 of them voted to separate from the PCUS while 94 opposed the resolution. The majority then united with another denomination and retained possession of the local church property. The Presbytery appointed a commission to investigate the dispute. The commission eventually issued a ruling declaring that the minority faction constituted the "true congregation" of the local church and withdrawing from the majority faction "all authority to exercise office derived from the [PCUS]."

Representatives of the minority faction brought a class action in state court, seeking declaratory and injunctive orders establishing their right to exclusive possession and use of the local church's property as a member of the PCUS. The trial court purported to apply Georgia's "neutral principles of law" approach to church property disputes. Under this analysis the court examined the deeds to the property, the state statutes dealing with implied trusts, the corporate charter of the local church and the constitution of the general church. Finding nothing that would give rise to a trust in any of these documents, the court held that legal title to the property of the local church was vested in the local congregation. Without further analysis or elaboration the court decreed that the local congregation was represented by the majority faction. The Georgia Supreme Court affirmed, holding that the trial court had correctly stated and applied Georgia law.

The United States Supreme Court granted certiorari. It held that as a means of adjudicating a church property dispute Georgia was constitutionally entitled to adopt a neutral principle of law analysis involving consideration of the deeds, state statutes governing the holding of church property, the local church's charter and the general church's constitution. It further reasoned that the First Amendment does not require the states to adopt a rule of compulsory deference to religious authority in resolving church property disputes even where no issue of doctrinal controversy was involved. Nevertheless it remanded the case because the Georgia courts failed to articulate the grounds for deciding that the majority faction represented the local congregation.

"It remains to be determined whether the Georgia neutral principles analysis was constitutionally applied on the facts of

---

1. This assumes, for sake of simplification, that plaintiffs could overcome the hurdle of "good standing" in the church. Defendants have questioned whether plaintiffs were in good standing as that status is defined in the bylaws. This too must await trial since the bylaws were not properly included in the record. The same rationale holds true for whether plaintiffs could prevail under either the formal title theory or the implied trust doctrine, both of which had been adopted for use in settling church property disputes. See *Smart v. Wesleyan Meth. Church* (1971), 257 Ind. 17, 271 N.E.2d 713 (applying implied trust doctrine) and *Price v. Merryman* (1970), 147 Ind.App. 295, 259 N.E.2d 883 (utilizing formal title theory).

this case. Although both the trial court and the Supreme Court of Georgia viewed the case as involving nothing more than an application of the principles developed in *Presbyterian Church II* [225 Ga. 259, 167 S.E.2d 658] and in *Carnes*, the present case contains a significant complicating factor absent in each of those earlier cases. *Presbyterian Church II* and *Carnes* each involved a church property dispute between the general church and the entire local congregation. Here, the local congregation was itself divided between a majority of 164 members who sought to withdraw from the PCUS, and a minority of 94 members who wished to maintain the affiliation. Neither of the state courts alluded to this problem, however; each concluded without discussion or analysis that the title to the property was in the local church and that the local church was represented by the majority rather than the minority. "Petitioners earnestly submit that the question of which faction is the true representative of the Vineville church is an ecclesiastical question that cannot be answered by a civil court. At least, it is said, it cannot be answered by a civil court in a case involving a hierarchical church, like the PCUS, where a duly appointed church commission has determined which of the two factions represents the 'true congregation.' Respondents, in opposition, argue in effect that the Georgia courts did no more than apply the ordinary presumption that, absent some indication to the contrary, a voluntary religious association is represented by a majority of its members.

"If in fact Georgia has adopted a presumptive rule of majority representation, defeasible upon a showing that the identity of the local church is to be determined by some other means, we think this would be consistent with both the neutral principles analysis and the First Amendment. Majority rule is generally employed in the governance of religious societies. See *Bouldin v. Alexander*, 82 U.S. 131, 15 Wall. 131, 21 L.Ed. 69 (1872). Furthermore, the majority faction generally can be identified without resolving any ques-

tion of religious doctrine or polity. Certainly, there was no dispute in the present case about the identity of the duly enrolled members of the Vineville church when the dispute arose, or about the fact that a quorum was present, or about the final vote. Most importantly, any rule of majority representation can always be overcome, under the neutral principles approach, either by providing, in the corporate charter or the constitution of the general church, that the identity of the local church is to be established in some other way, or by providing that the church property is held in trust for the general church and those who remain loyal to it. Indeed, the State may adopt any method of overcoming the majoritarian presumption, so long as the use of that method does not impair free exercise rights or entangle the civil courts in matters of religious controversy.

"Neither the trial court nor the Supreme Court of Georgia, however, explicitly stated that it was adopting a presumptive rule of majority representation. Moreover, there are at least some indications that under Georgia law the process of identifying the faction that represents the Vineville church involves considerations of religious doctrine and polity. Georgia law requires that 'church property be held according to the terms of the church government,' and provides that a local church affiliated with a hierarchical religious association 'is part of the whole body of the general church and is subject to the higher authority of the organization and its law and regulations.' *Carnes v. Smith*, 236 Ga. [30], at 33, 38, 222 S.E.2d [322], at 325, 328; see Ga.Code §§ 22–5507, 22–5508. All this may suggest that the identity of the 'Vineville Presbyterian Church' named in the deeds must be determined according to terms of the Book of Church Order, which sets out the laws and regulations of churches affiliated with the PCUS. Such a determination, however, would appear to require a civil court to pass on questions of religious doctrine, and to usurp the function of the commission appointed by the Presbytery, which already has determined

that petitioners represent the 'true congregation' of the Vineville church. Therefore, if Georgia law provides that the identity of the Vineville church is to be determined according to the 'laws and regulations' of the PCUS, then the First Amendment requires that the Georgia courts give deference to the presbyterial commission's determination of that church's identity.

"This Court, of course, does not declare what the law of Georgia is. Since the grounds for the decision that respondents represent the Vineville church remain unarticulated, the judgment of the Supreme Court of Georgia is vacated and the case is remanded for further proceedings not inconsistent with this opinion.

"It is so ordered." (Footnotes omitted.) 443 U.S. at 606–610, 99 S.Ct. at 3024.

On remand the Georgia Supreme Court in *Jones v. Wolf* (1979) 244 Ga. 388, 260 S.E.2d 84 held that in local schism cases Georgia has adopted a presumptive rule of majority representation, defeasible upon a showing that the identity of the local church is to be determined by some other means. It noted that the presumption may be overcome by reliance upon neutral statutes, corporate charters, relevant deeds and organizational constitutions of the denomination. Applying these principles the court ruled:

"A review of those sources discloses no provision that would rebut the Georgia presumption of majority rule as to the right to control the actions of the titleholder—that is, as to the right to possess, enjoy and control the use of these church premises. This silence distinguishes the present case from *Crumbley v. Solomon* [243 Ga. 343, 254 S.E.2d 330], *supra.* "The judgment of the trial court is affirmed for the reasons stated in this opinion."

260 S.E.2d at 85.

Likewise, Indiana recognizes that in local schism cases the principle of presumptive majority rule applies as to the right to control the actions of the titleholder; that is, as to the right to possess, enjoy and control the use of church premises. *Stansberry, etc. et al. v. McCarty et al.* (1958),

238 Ind. 338, 149 N.E.2d 683. Of course, this presumption may be rebutted if an application of neutral principles of law involving an examination of such sources as state statutes, corporate charters, relevant deeds, local by-laws and the organizational constitutions of the denomination discloses that the identity of the local church is to be otherwise determined.

In the case at hand both parties claim to represent the majority of the St. George congregation. Such a factual determination is for the trial court.

Affirmed in part and remanded in part with instructions for the trial court to proceed in a manner consistent with this opinion.

GARRARD and STATON, JJ., concur.