John T. **BRIDGEFORTH,** in his official capacity as Trustee of Greater St. Mark Missionary Baptist Church; Laura M.A. Smith, in her official capacity as Trustee of Greater St. Mark Missionary Baptist Church; and Lorraine Looper, in her official capacity as Clerk of Greater St. Mark Missionary Baptist Church, Appellants–Plaintiffs,

v.

Rev. Joy L. **THORNTON;** Georgia L. Turner; Calvin O'Neal; Horace Tramble; and Wayne Brown, Appellees–Defendants.

No. 49A05–0505–CV–00288.

Court of Appeals of Indiana.

May 25, 2006.

Michael L. Schultz, Indianapolis, for Appellants.

Scott D. Himsel, Daniel R. Roy, Baker & Daniels LLP, Indianapolis, for Appellees.

## OPINION

VAIDIK, Judge.

### Case Summary

The present case reaches this Court as a result of an ongoing and lamentable feud within the congregation of Greater St. Mark Missionary Baptist Church. To date, this dispute regarding control of the church's Board of Trustees has wreaked havoc on this congregation for nearly two-and-a-half years, leaving its membership fractionalized and continuously jeopardizing its day-to-day operations. The Appellants, who were temporarily reinstated as the duly elected Trustees of the church under the trial court's judgment, argue that the court lacked the jurisdictional authority to concurrently order that a new election be held forthwith to determine whether the congregation, indeed, wished to remove them from office. They further argue that the trial court erred by denying their claim for damages under the Indiana Crime Victim's Relief Act. Finding that the trial court properly exercised its jurisdiction and that the Trustees failed to prove their case under the Crime Victim's Relief Act, we affirm the holding of the trial court.

### Facts and Procedural History

Greater St. Mark Missionary Baptist Church ("GSM") is a congregational church on the east side of Indianapolis. By definition, a congregational church is a church formed under a congregational theory of church government, i.e., "a system of church government in which the local congregation has full control and final authority over church matters within its own area." *Webster's Third New International Dictionary* (1993). GSM does not adhere to any church constitution or bylaws; however, it does follow a single church governance document—the one-page "Church Covenant." The parties contend that one clause within the Church Covenant is relevant to the dispute before us, and that clause provides:

> In case of difference of opinion in the church, we will strive to avoid a contentious spirit, and if we cannot unanimously agree, we will cheerfully recognize the right of the majority to govern.

Appellee's App. p. 308.

In order to facilitate the congregational governance of the church, GSM has traditionally maintained a Board of Trustees whose responsibilities include "the safekeeping of church property, to account for the assets of the church, and [responsibility] for church property in all of the ways trustees are typically responsible for such property under Indiana law." Appellant's Br. p. 4 (citing Ind.Code § 23–10–2–1 *et seq.* (outlining duties and powers of an association's trustees)). Along with a Board of Deacons, the Board of Trustees has traditionally called for and facilitated the business meetings of the church by publishing notice of meetings in Sunday bulletins and giving notice from the pulpit for at least two weeks before any meeting is to be held. Business meetings at GSM are customarily held on Tuesdays. Elections for the Board of Trustees are traditionally held annually in December, and each individual trustee's term is typically either two or three years. However, until the present action was initiated in 2004, no elections for any trustee positions had been held since at least 1999. Appellants and Plaintiffs below (collectively referred to as the "Trustees") are two duly elected members of the Board of Trustees, John T. Bridgeforth and Laura M.A. Smith, and the duly elected Church Clerk, Lorraine Looper.

Appellee, the Rev. Joy L. Thornton, was hired by GMS as pastor following a majority vote to that effect in September 1999. Over time, Rev. Thornton and the Boards of Deacons and Trustees (collectively referred to as "the Boards") developed a strained relationship, and the Boards decided, without notice to or a vote by the congregation, to terminate his employment in January 2004. However, many members of the congregation disagreed with the Boards' decision to terminate Rev. Thornton, and he refused to leave his position as pastor. Without notice to or the express authority of the congregation, the Trustees, allegedly representing GSM, filed a lawsuit on February 10, 2004, seeking an injunction to enforce their termination of Rev. Thornton. Following a regularly-scheduled worship service on February 11, 2004, GSM's congregation held a meeting at which the congregation voted 185–2 to retain Rev. Thornton and to "remove all officers that signed a notice of dismissal" of the pastor. Appellant's App. p. 64. On February 13, 2004, Judge Robyn L. Moberly conducted a hearing on the matter and, on February 24, 2004, entered special findings of fact, including the following:

4. That the congregation has the ultimate authority regarding a pastor's employment and no reliable vote of the congregation has been accomplished to determine the will of the majority of the congregation of the Church;

5. That it is necessary that a vote of the congregation be taken under controlled circumstances to determine the will of the majority with respect to [Rev. Thornton's] employment; . . .

*Id.* at 57, Order on Petition for Preliminary Injunction. Pursuant to this order, GSM held a vote on the sole issue of Rev. Thornton's employment and, by a vote of 298–146, voted to retain Rev. Thornton as pastor of the church. Judge Moberly certified this vote on March 10, 2004. The parties agree that this vote did not address the continued service of any other church leaders.

Also on March 10, 2004, hundreds of GSM members met at the church and voted to remove "the entire staff" of GSM and to change the locks at the church in order to prevent the displaced staff members from entering church offices. *Id.* at 66. The congregation also voted to appoint Appellees Wayne Brown, Calvin O'Neal, and Horace Tramble as interim financial officers to "secure the [church's] monies on deposit at Bank One . . . [and] oversee the finances."[1] *Id.* Though a large portion of the congregation apparently attended this vote, no advance notice of the meeting was given.

The following day, Rev. Thornton, Brown, O'Neal, and Tramble (collectively referred to as "the New Officers") went to Bank One to inform bank officers that they had been appointed by GSM to oversee its financial operations and to request that Bank One remove the Trustees and substitute the New Officers as signatories to GSM's account, thereby providing them access to the funds contained therein. The New Officers presented a letter dated February 13, 2004, which indicated the results of the February 11, 2004, "vote" removing church officers who signed a notice of dismissal for Rev. Thornton. *See id.* at 64. Bank One determined that the letter was insufficient to justify the substitution of the New Officers in place of the

---

**1.** GSM apparently held multiple accounts with Bank One totaling approximately $1 million. For the purposes of this opinion, we generally refer to these accounts collectively in the singular form.

Trustees as signatories to GSM's account at that time. As further support for their position, then, the New Officers faxed Bank One a document dated March 10, 2004, detailing the events of the March 10, 2004, church meeting, where Brown, O'Neal, and Tramble were appointed as GSM's interim financial officers. *See id.* at 135. The bank again denied the New Officers' request to access the GSM account.

On March 12, 2004, Brown phoned the Bank and stated that the New Officers needed to be added as signatories to GSM's account because they needed to write payroll checks at that time. Consequently, the bank allowed the New Officers to be added as signatories, but refused to remove the Trustees from the account unless one of the Trustees requested such an action. On March 18, 2004, the New Officers met with Bank One employee Carolyn Whittle to execute signature cards adding them as signatories to the original GSM account. Following this action, the New Officers instructed Ms. Whittle to set up a new account for GSM on which only the New Officers were signatories, and they proceeded to transfer all of the funds from the existing GSM account into this new account, thereby precluding any of the Trustees from accessing GSM funds. This transfer was completed without the knowledge or authority of any other Bank One employee, aside from Whittle. After learning of the New Officers' actions, the Trustees notified Bank One of the dispute within the church, and Bank One subsequently froze GSM's accounts.

On April 6, 2004,[2] the Trustees filed the present lawsuit, again allegedly in their capacity as church representatives, against Rev. Thornton, Brown, O'Neal, and Hor-

ace. The Trustees' amended complaint in this second lawsuit asserted that the March 10, 2004, vote removing them from their elected positions was void because notice of the vote was not given, and the complaint seeks, in part, the following relief:

B. A judgment declaring the rights, duties, and legal relations of [the Trustees] and [the New Officers] with regard to the property of the church, and specifically with regard to the Church's Bank One accounts and funds;

C. A permanent injunction precluding [the New Officers], or any of them, from taking further steps to interfere in any way with [the Trustees'] discharge of their official duties or to attempt in any way to gain control of the Church's property, including, but not limited to, the Church's Bank One accounts; ....

*Id.* at 53. Further, the Trustees asserted that the New Officers committed criminal mischief and conversion through their acts to gain control of GSM's Bank One account and sought damages pursuant to the Crime Victim's Relief Act, Indiana Code § 34–24–3–1, which allows for treble damages in actions brought under Indiana Code art. 35–43 (including criminal mischief and conversion).

In the meantime, an "emergency meeting" was held at GSM on April 14, 2004. Notice of this meeting was provided on April 7, 2004, through a printed bulletin and possibly through an announcement from the pulpit. The written notice informed the congregation that the Trustees had filed this lawsuit and set forth the following issues for a pending vote:

**2.** We herein reference only the amended complaint, filed November 8, 2004, as it is the only copy contained in the record before us.

1. Whether [the Trustees] shall be directed to proceed with the above-captioned lawsuit or dismiss the above-captioned lawsuit on behalf of [GSM].
2. Whether or not [the Trustees] shall be directed to inform Bank One that [Brown, O'Neal, and Tramble] are authorized to transact business for or on behalf of [GSM] and that the freeze on all account[s] imposed by Bank One should be immediately lifted.
3. Whether or not [the Trustees] are authorized or are not authorized to expend funds or incur any financial obligation on behalf of [GSM] in the above-captioned lawsuit.
4. Whether or not [GSM] is authorized to be financially responsible for legal counsel hired by [the New Officers] in the above legal action.

Appellee's App. p. 309. In addition, the Reverend Dr. Edward Wheeler, an ordained Baptist minister and President of the Christian Theological Seminary in Indianapolis, was asked to serve as an impartial moderator for the meeting. The congregation voted roughly three-to-one to instruct the Trustees to dismiss the lawsuit, to give Bank One notice of Brown, O'Neal, and Tramble's authority, and to deny reimbursement of the Trustees' expenses, and they voted roughly two-to-one to reimburse the New Officers for their expenses. In spite of these results, the Trustees moved forward with this lawsuit.

An emergency hearing was held on April 27, 2004, after which the trial court issued an Interim Order in which it ordered that no person "shall take, dispense with, sell, offer for sale, remove, conceal, mortgage, transfer, waste or give away, encumber, or otherwise alienate or dispose of any" property belonging to GSM. Appellant's App. p. 32. The order also provided for the payment of church operating expenses, or-

dered Bank One to return all of GSM's funds to its original account, called for an accounting of the Bank One funds, and provided that one Trustee—Bridgeforth—and one New Officer—O'Neal—would act as signatories on the account. *Id.* at 32–34.

On December 15, 2004, GSM held its annually scheduled business meeting. Traditionally, this meeting addresses, among other issues, the elections of new officers to the church's Boards. At this meeting, the congregation elected an entirely new slate of trustees and a new church clerk. On January 2, 2005, this new church administration directed the Trustees and their attorneys to "immediately dismiss with prejudice" the current proceedings. *Id.* at 80, 86. They further directed Bridgeforth, as cosignatory to the Bank One account, to comply with O'Neal in making payment on the past due amounts of the New Officers' legal fees. The Trustees and their attorneys refused to comply with these directions, and they moved forward with this lawsuit. Subsequently, the New Officers filed an Emergency Motion for Relief Under Interim Order and Order of Attorney's Fees, and on March 28, 2005, the trial court, citing its previous Interim Order, ordered payment of all fees for both parties' attorneys. *Id.* at 39–40.

A bench trial was held on March 14–15, 2005, and the trial court entered judgment in this case on April 29, 2005 (the "Judgment"). In its Judgment, the court held that "[t]he meetings held by [the New Officers] on February 11, 2004, March 10, 2004, and April 14, 2004, and any and all other meetings called and conducted at [the New Officers'] behest, were not in conformity with the customs, policies, and practices of [GSM]." *Id.* at 27. Further, it held that the Trustees are the "duly elected" trustees of GSM and that they there-

fore had standing to bring this action. *Id.* at 15. The trial court ordered that the Trustees "shall retain their respective positions with the Church and the [New Officers] are hereby restrained from interfering or otherwise prohibiting the [Trustees] from carrying out the duties and responsibilities of their respective offices until a duly conducted election can be held." *Id.* at 28. The court ordered a new election to be held on June 28, 2005, "[i]n order to insure the continuity and effectiveness of the Church's business," and it set forth the conditions and requirements for the election in what it considered to be substantial conformity with the traditions, customs, and usual practices of GSM. *Id.* at 28–29. Finally, the trial court "denie[d] [the Trustees'] request for economic damages and for a finding of willful, wrongful and criminal activity on behalf of the [New Officers] as the evidence does not support [the Trustees'] entitlement to the requested relief." *Id.* at 29.

On May 24, 2005, the Trustees filed a Motion for Stay Pending Appeal with the trial court, arguing that the trial court lacked jurisdiction to order an election because it had already resolved the property dispute between the parties by finding that the Trustees were never validly removed from their official positions with GSM. Following an evidentiary hearing, the trial court denied this motion, finding that:

> There is ample evidence in the record at trial, supplemented by offers of proof at the June 14, 2005, hearing, that strong disagreements, dissensions, and tensions continue as to who controls the Church's property. There is in the Church a tug-of-war regarding who may control the Church's property .... The Court finds that the Church is in utter chaos at this point. An election of trustees sooner rather than later is more likely to secure the Church's property.

> \* \* \* \* \* \*

> This is a case where the court was asked to clarify who should be in control of the Church's property. The Court determined in its April 27, [2005], Judgment and reaffirms that it is in the best interests of the Church and the members, in order to preserve Church property, to hold an election to allow the majority to designate who they wish to handle their Church's property.

*Id.* at 203–04. Not to be deterred in their efforts to stop the election, the Trustees filed a petition for writ of prohibition with the Indiana Supreme Court on June 24, 2005. Appellee's App. p. 234–39. Our Supreme Court ruled that the Trustees' petition sought "an unquestionably inappropriate remedy under the rules and law governing writs of mandamus and prohibition," and the action was dismissed. *Id.* at 241.

Thereafter, the election was held on June 28, 2005. Each party submitted a slate of nominees for all of the trustee positions and for the position of church clerk. The Trustees' candidates lost in voting for each position on the ballot by roughly a two-to-one margin. On July 1, 2005, the trial court certified the election results and lifted its orders restricting the New Officers' activities and the Church's property. This appeal now comes before us.

### Discussion and Decision

The Trustees raise two issues on appeal: (1) whether the trial court exceeded the scope of its jurisdiction when it ordered a church election after it had concluded that the Trustees retained their elected positions within GSM; and (2) whether the trial court erred in finding that the evidence was insufficient to support their claim under the Crime Victim's Relief Act. We address each issue herein.

## I. Jurisdiction to Order Church Election

In their motion to stay, the Trustees argued that the trial court lacks the subject matter jurisdiction necessary to enforce its election order; hence, this motion to stay is akin to a motion to dismiss for lack of subject matter jurisdiction under Indiana Trial Rule 12(B)(1), and we apply that settled standard for our review. The standard of review, then, for lack of subject matter jurisdiction is dependent upon what occurred in the trial court. *GKN Co. v. Magness*, 744 N.E.2d 397, 401 (Ind.2001). Where jurisdictional facts are not in dispute or where the trial court determines disputed facts based on nothing more than a "paper record," the applicable standard of review is *de novo. Id.* However, where, as here, the jurisdictional facts were disputed and the trial court conducted an evidentiary hearing to address the issue, the applicable standard of review requires this Court to give deference to the trial court's findings of jurisdictional facts. *Id.* Thus, we will reverse the trial court here only if its findings of fact or judgment are clearly erroneous. *See id.* "Factual findings are clearly erroneous if the evidence does not support them, and a judgment is clearly erroneous if it is unsupported by the factual findings or conclusions of law." *Id.*

In its Judgment, the trial court discussed the proper exercise of jurisdiction over church disputes in its Finding Number 2:

> The cases discussing the limits of a court's power to decide church controversies are seemingly innumerable. However, the Indiana Court of Appeals was able to summarize the law in this area as follows:
>
>> There is extensive case law discussing the resolution by a civil court of church property disputes. *See, e.g., Presbyterian Church v. Hull Church,* (1969) 393 U.S. 440, 89 S.Ct. 601, 21 L.Ed.2d 658; ... *Marich v. Kragulac,* (1981) Ind.App., 415 N.E.2d 91; ... *Merryman v. Price,* (1970) 147 Ind. App. 295, 259 N.E.2d 883, cert. denied, 404 U.S. 852, 92 S.Ct. 89, 30 L.Ed.2d 92 (1971). All of the decisions commence by citing the well-settled point of law that the state has a legitimate interest in resolving property disputes, and that a **civil court is a proper forum** for that resolution. *Marich, supra,* at 96. This statement is tempered, however, by the warning that special problems arise when the disputes implicate controversies over church practices. *Presbyterian Church, supra,* 393 U.S. at 445, 89 S.Ct. at 604. **The First Amendment prohibits a court from adjudicating matters of purely ecclesiastical concern.** *Id.* at 449, 89 S.Ct. at 606. Nevertheless, **"it is also true that the source of the controversy, i.e., whether the property dispute is motivated by a controversy over doctrinal practices, is not determinative of whether the civil courts can intervene to decide church property disputes. To so hold would too narrowly restrict the scope of the court's jurisdiction".** *Marich, supra,* at 96, citing *Merryman, supra.* **Thus, the relevant inquiry is whether the court can resolve the property dispute on the basis of neutral principles of law which do not involve the resolution by the court of ecclesiastical issues.** *Id.*

Appellant's App. p. 16–17 (quoting *Hinkle Creek Friends Church v. Western Yearly Meeting of Friends Church,* 469 N.E.2d 40, 43 (Ind.Ct.App.1984), *reh'g denied, trans. denied* ) (emphases supplied by trial court) (some internal citations omitted).

██ On appeal, then, the Trustees acknowledge that a property dispute was before the trial court because they asked the court to determine who was in control of GSM's assets. However, the Trustees argue on various grounds that the trial court "crossed the line," Appellant's Reply Br. p. 4, when it ordered GSM to hold an election. First, the Trustees contend that the trial court finally and fully decided this controversy when it ruled that the Trustees were the last duly elected trustees of the church and should be returned to their positions. According to the Trustees, then, it follows that because the property dispute was settled, the trial court was divested of its jurisdictional authority over the case and so could not order an election to determine, *prospectively*, who should control the church's property.

██ We agree with the Trustees that to order an election *after* the property dispute was fully settled would constitute an interference with the ecclesiastical practices of the church. *See Hinkle Creek Friends*, 469 N.E.2d at 43. However, the New Officers argue that the trial court retained jurisdictional authority over this case after it determined that the Trustees should be reinstated because the property dispute between the parties was still ongoing. The New Officers essentially claim that the trial court's reinstatement of the Trustees to their positions settled only *part of* the underlying property dispute by determining that the earlier elections ousting the Trustees from their positions were invalid. The obvious question remaining in the dispute, however, asked whether the congregation had the right to hold a valid election to determine if the Trustees should, in fact, be removed from the Board. The New Officers suggest that the trial court, recognizing that the congregation did have a right to hold an election,[3] sought to remedy this portion of the dispute by ordering the election, which election was intended to *finally and fully* settle the property dispute. Considering the findings of the trial court both in its Judgment and in its order on the Trustees' motion to stay, we find the New Officers' argument to be correct.

The posturing of this case in the Trustees' amended complaint makes it clear to us that it was never their intent nor understanding that once the trial court returned them to office, it would be divested of

---

3. Citing the Church Covenant, the trial court found that GSM is a congregational church governed by majority will. *See* Appellant's App. p. 22, Finding Number 16. Applying Indiana case precedent to the case at bar, then, the trial court recognized the rule in *Cole v. Holt*, 725 N.E.2d 145, 148 (Ind.Ct.App. 2000), *trans. denied*, which provides:

> When presented with a dispute within a church of congregational polity, our courts will uphold the majority's decision, whether that is to purchase property or even remove the minister, unless the church has established its own decision-making body with the power to override the will of the majority.

*See* Appellant's App. p. 26–27, Conclusions Numbers 5 & 6. Recognizing the validity of the *Cole* rule, the Trustees argue in their reply brief that the Board of Trustees has been established as the governing body of GSM and indeed has the power to override the will of the majority. We are unable to accept this assertion for a number of reasons. First, we note that the precursor to this lawsuit came before Judge Moberly's courtroom because the majority of the congregation disagreed with the Trustees' decision to dismiss Rev. Thornton. The congregation won that lawsuit, indicating their ability to override decisions rendered by the Board of Trustees. Second, the Trustees' assertion is directly in conflict with the Church Covenant; if the Trustees' decisions controlled in this church, the Church Covenant—the single document upon which the governance and establishment of this church is based—would be rendered meaningless on this point. We consider such a result to be absurd. The evidence here supports the trial court's finding that this church is governed by the will of its majority.

jurisdiction to enforce a more complete remedy to this conflict. The amended complaint states the following:

> WHEREFORE, Plaintiffs, by counsel, respectfully request the following relief:
>
>   *     *     *     *     *     *
>
> B. A judgment *declaring the rights, duties, and legal relations* of Plaintiffs and Defendants with regard to the property of the church, and specifically with regard to the Church's Bank One accounts and funds;
>
> C. *A permanent injunction precluding Defendants, or any of them, from taking further steps to interfere in any way with Plaintiffs' discharge of their official duties or to attempt in any way to gain control of the Church's property,* including, but not limited to, the Church's Bank One accounts;
>
> . . . .

Appellant's App. p. 53 (emphases added). In their prayer for relief, then, the Trustees expressly requested the trial court to declare the rights of the parties and to provide *prospective* relief by preventing the New Officers from interfering with their control of GSM's property once they were reinstated to their Board positions. The New Officers convincingly suggest that the relief sought by the Trustees included an injunction preventing the congregation from holding any election before the annually held business meeting in December and thereby securing a seven-month term of office for the Trustees whether the congregation wanted them there or not. Having requested such relief, the Trustees now appeal from the trial court's grant of a complementary version of that relief—an election to determine whether the Trustees should, in fact, be removed from their offices.

The Trustees were aware that the property dispute they brought before the trial court could not be settled merely by returning them to power, as it were, but only by providing for the *continued* and *future* control of the church's property. The fact that the trial court, when faced with a surfeit of evidence indicating that the congregation of GSM wished to prevent the Trustees from regaining control of the church's property, crafted a remedy to ultimately provide prospective relief that was in a form preferred by the defendant-party does not diminish the court's jurisdiction over the ongoing property dispute. Had the trial court considered the property dispute fully settled upon its determination that the Trustees should return to their offices, it goes without saying that it would not have seen any need to order a further remedy. The trial court was asked to provide prospective relief in order to fully settle this property dispute, and it did so.

■ The Trustees advance a companion argument, however, contending that Indiana courts are without jurisdiction to order a *church election,* specifically, as a form of relief because the administration of church elections is, *per se,* ecclesiastical. Pursuant to this reasoning, the Trustees' argument suggests that even if they *did* ask for prospective relief and such relief *is* required in order to fully and completely settle this property dispute, that relief cannot come in the form of a court-ordered, court-supervised church election because the court, then, would be "adjudicating matters of purely ecclesiastical concern," *see Hinkle Creek Friends,* 469 N.E.2d at 43, and this it cannot do. The New Officers agree that church elections are, ordinarily, of an ecclesiastical nature, but counter that where ordering an election is necessary for a court to resolve an underlying property dispute, such a remedy is appropriate. While this precise issue has not previously been addressed in our courts, both parties suggest case law that they argue advances their points.

As support for their argument, the Trustees regard *State ex rel. Givens v. Superior Court of Marion County,* 233 Ind. 235, 117 N.E.2d 553 (1954), as the seminal case on this subject. In *Givens,* members of a trade union obtained an order from the trial court requiring the acting officers of the union to hold an election and to include the complaining members' names on the voting ballot. The officers applied for a writ of prohibition wherein they questioned the court's jurisdiction to interfere with the union's election processes. In granting the writ restraining the trial court's order, our Supreme Court stated:

> The power to hold an election is political and not judicial, and equity has no jurisdiction to restrain officers from the exercise of such powers or to compel their exercise.
>
> Any attempt by the courts to compel the officers of the union to perform their duties pertaining to the election of officers, which duties are enjoined solely by the constitution of the union, would be an unlawful interference with, and a regulation of, its internal affairs.
>
> \* \* \* \* \* \*
>
> The right to vote in an election for officers of such a union is one which stems from membership therein and is one of the privileges extended by its constitution to all members in good standing.

*Id.* at 555 (citations omitted).

However, in citing *Givens,* the Trustees ignore at least two points that distinguish the case from the one at bar, both of which are illustrated throughout the following passages of the opinion:

> Hence, the trial court here is without jurisdiction to grant the relief sought *unless plaintiffs' complaint is based upon, and seeks the protection of, some civil or property right.*
>
> \* \* \* \* \* \*
>
> When plaintiffs ... became members of the union they became so *upon the con-*

*ditions set forth in its constitution and by-laws,* and if dissatisfied with the administration and enforcement of such conditions they cannot invoke the power of a court of equity for such enforcement, *unless their civil or property rights are invaded.*

> \* \* \* \* \* \*
>
> Membership in an unincorporated association, such as the one before us, *is a privilege and is neither a civil nor property right.*
>
> \* \* \* \* \* \*
>
> The right to participate in the establishment and management of the government of the union through voting for its officers and the privilege of becoming a candidate for an office therein is a political right incident to the privilege of membership. *It involves no property right and since it stems wholly from the constitution of the union and not by virtue· of citizenship, it is not a civil right.*
>
> \* \* \* \* \* \*
>
> Since courts of equity will not interfere with the internal affairs of an unincorporated association, *unless civil or property rights are involved,* and none such are here present, the trial court was without jurisdiction of the subject-matter of the action or class of case.

*Id.* at 555–56 (emphases added) (citations omitted). It is undisputed that GSM has no written constitution or bylaws covering the administration of its elections, and the trial court here attempted to conform the administration of its ordered election to the traditional and customary standards of the church. In addition, even *Givens* implies that where civil or property rights are involved—as in this case—a court may properly exercise jurisdiction to oversee an association's election processes if it is necessary to do so in order to resolve the

dispute. For these reasons, we find *Givens* to be inapposite as applied to the facts before us.

Conversely, the New Officers cite two opinions from sister jurisdictions as persuasive support for their position on this issue. *See Howard v. Johnson,* 264 Ga.App. 660, 592 S.E.2d 93 (2003), *reconsideration denied; Reid v. Gholson,* 229 Va. 179, 327 S.E.2d 107 (1985). Both cases advance the concept that courts may order elections to resolve property disputes within congregational churches. In *Howard,* much like in this case, the trial court invalidated the results of an election of the church's leadership because of a lack of notice of the meeting at which the election was held. 592 S.E.2d at 94. The court then ordered an election to determine which of the two factions within the church had the support of the majority of the congregation, and it designated the procedure to be followed for the election based on its understanding of the church's customary procedures. In upholding the trial court's decision, the Georgia Court of Appeals stated:

> In this case, *the trial court could not determine from the evidence presented by the parties which faction had majority support to control the church property.* And the trial court designed the election in this case for the sole purpose of resolving that issue. The rules set by the court for holding the election were intended to insure the fairness of the process and were justified by the prior conduct of the two factions.

*Id.* at 95 (emphasis added).

The facts of *Reid v. Gholson* are not as directly analogous to our case as *Howard,* but the case nevertheless informs our analysis of the matter at hand. *See* 229 Va. 179, 327 S.E.2d 107. The congregational church in *Reid* had been asked by its pastor to vote on the use of church funds to construct a $12 million senior center. In order to skew the outcome to his pref-

erence, the pastor called several votes without giving notice, manipulated vote totals, and refused voting rights to certain members of the church. As in our case, the trial court in *Reid* invalidated the results of the numerous votes held before and during the pendency of the lawsuit. As a remedy, the trial court ordered that an election be held, pursuant to procedures to be agreed upon by the parties, wherein a court-appointed special commissioner would oversee the election in order to guarantee its validity. The Virginia Supreme Court upheld the trial court's order, finding that although courts must be careful to avoid weighing in on ecclesiastical concerns, they may still exercise jurisdiction over church matters involving property disputes. Noting that courts should not interfere with the legitimate decisions of an authorized governing body of a church or with decisions arrived at through fairly-conducted meetings of a congregation, the court noted:

> The situation is otherwise, however, when the members of a congregational church merely seek the protection of the court for the purpose of obtaining a fairly-conducted meeting in the first place. Here the analogy to hierarchical churches breaks down because there is no body of ecclesiastical law to invoke, no internal tribunal to appeal to. A member of a congregational church, seeking the aid of the court in protecting his civil and property rights, may appeal only to the simple and fundamental principles of democratic government which are universally accepted in our society. These principles include the right to reasonable notice, the right to attend and advocate one's views, and the right to an honest count of the votes. Such rights are fundamental to our notions of due process. They are neutral principles of law, applicable not only to religious bodies, but to public and private lay organi-

zations and to civil governments as well. Courts must apply them every day, and can do so without any danger of entering a "religious thicket."

*Id.* at 113.

The decisions in *Howard* and *Reid* provide well-reasoned templates upon which we may base our analysis. *Howard* indicates support for the proposition that where a trial court is unable to determine which of two parties has the support of the majority of a congregation regarding a congregational church property dispute, that court may order an election to determine that fact. *Reid* invokes the policy upon which this is based: that it is appropriate for a court to assert jurisdiction when dealing with a congregational church property dispute where the congregation of the church has been unable or is ill-equipped to fairly resolve the dispute within the church and where the issue can be resolved by the application of those "fundamental principles of democratic government" and "neutral principles of law" that a court routinely uses to settle disputes, provided that the court may do so without concerning itself with the ecclesiastical practices of the church. Moreover, these cases are easily harmonized with the idea expressed in our Supreme Court's opinion in *Givens*, which recognizes that courts may assert jurisdiction over church disputes involving civil or property rights. Applied to the facts of this case, it cannot be said that the trial court fully resolved this church property dispute merely by reinstalling the Trustees to their official positions, nor that the court encroached on the ecclesiastic territory of GSM when it ordered a vote to determine which faction of this divided church represented the majority and so should prevail in the final resolution of this dispute. Thus, the trial court did not commit clear error and its finding of jurisdiction was proper.

## II. Sufficiency of Evidence on Damages Claim

At the outset, we note that the trial court here entered findings of fact in its Judgment. When a trial court enters such findings, we must determine whether the evidence supports the findings and whether the findings support the judgment. *Lake County Trust Co. v. Jones*, 821 N.E.2d 1, 3 (Ind.Ct.App.2004), *reh'g denied*. The court's findings and conclusions will be set aside only if they are clearly erroneous, that is, if the record contains no facts or inferences supporting them. *Id.* Because the Trustees here appeal from a negative judgment with respect to their claims under the Crime Victim's Relief Act, they must demonstrate to this Court that the trial court's judgment is contrary to law. *Infinity Products, Inc. v. Quandt*, 810 N.E.2d 1028, 1032 (Ind. 2004), *reh'g denied*. "A judgment is contrary to law only if the evidence in the record, along with all reasonable inferences, is without conflict and leads unerringly to a conclusion opposite that reached by the trial court." *Id.*

The Trustees filed a claim for damages under the Indiana Crime Victim's Relief Act, alleging that the New Officers had committed conversion and criminal mischief. Because the Trustees crafted their claim pursuant to the Crime Victim's Relief Act, which requires a showing of pecuniary damages in order to entitle a party to any recovery, *see* I.C. § 34–24–3–1, we may dispose of this claim on the basis that GSM suffered no pecuniary loss as a result of the New Officers' actions. The trial court addressed this issue in its Judgment and made the following pertinent findings and conclusions:

29. The Court finds that although the [New Officers] attempted to change the signatories on the Church's accounts without notice to

the [Trustees], *the [New Officers] did not abscond, steal, dispose of, waste or exercise any personal ownership or control over the property of the Church, and that such property remained intact and in the name of the Church at all times,* with the same address, with the same tax ID number.

30. *The [Trustees] have failed to meet their burden that [the Trustees] or the Church suffered any monetary damages as a result of [the New Officers'] acts;* further the court finds that the [Trustees] did not establish and prove, with credible evidence, any willful, wrongful and criminal activity on the part of any of the [New Officers] in this proceeding.

\*     \*     \*     \*     \*     \*

9. The Court denies [the Trustees'] request for economic damages and for a finding of willful, wrongful and criminal activity on behalf of the [New Officers] as *the evidence does not support [the Trustees'] entitlement to the requested relief.*

*Id.* at 25–26, 30 (emphases added).

Contrary to the trial court's clear and forthright statements on the matter, the Trustees insist that "[t]he *undisputed evidence at trial, and the trial court's findings and conclusions,* [ ] admit of only one conclusion: that [the Trustees/GSM] suffered a pecuniary loss by virtue of [the New Officers'] unauthorized actions." Appellant's Br. p. 28 (emphasis added). Our review of the record fails to uncover any support for this conclusion.

The evidence before the court established that the New Officers exercised control over GSM's bank account from March 11, 2004, through June 2, 2004, when the trial court ordered Bridgeforth and O'Neal to act as cosignatories on the account. *See* Appellant's App. p. 34. Carolyn Whittle, the Bank One employee who added Brown,

O'Neal, and Tramble as signatories to GSM's account and who set up the new account on their behalf, testified that while the names on the account and the account number changed, the account was always owned by GSM and held in its name under its address and tax identification number, with any interest accruing on the account being paid to GSM. Dep. of Carolyn Whittle, p. 49–50. In addition, the trial court ordered a full accounting of GSM's assets for the period of time during which the New Officers controlled the bank account, and both the Trustees and the trial court reviewed this accounting and determined it to support the New Officers' assertion that the funds were properly used on behalf of GSM. Tr. p. 486–87, 526, 539. Accordingly, the evidence presented to the trial court supports its finding that GSM suffered no pecuniary loss and that, therefore, the Trustees cannot recover under the Crime Victim's Relief Act.

Anticipating the above analysis, however, the Trustees urge this Court to examine the matter of pecuniary loss "from the perspective of [the Trustees], not the Church." Appellant's Br. p. 28. They contend that "[i]t is not [the Trustees'] burden to prove that some third party suffered a loss; they need only prove that they did." *Id.* Although their argument lacks any citation to legal authority supporting this proposition, the Trustees go on to reason:

If the rule were otherwise, then any time a small group of individuals desired to control a church they could simply gain control of the church's bank accounts under false pretenses but escape liability for their conduct by keeping the church's name on the accounts. There would be no mechanism by which the duly-elected officers of the church could protect the church's assets from misappropriation by unauthorized persons.

*Id.* First, we find this portentous warning to completely ignore the relevant facts of this case. The New Officers were not a "small group of individuals" who "simply gain[ed] control of the church's bank accounts under false pretenses." Instead, they were a group of individuals in a congregational church governed by its majority who believed they were authorized by that majority to gain control of the church's bank account for the express purpose of conducting transactions within the ordinary business activities of the church. Moreover, where any abject, criminally-minded individuals might, in fact, maneuver to gain control of a church's funds, the fact remains that there *is* a mechanism in place to protect such funds from misappropriation: actual misappropriation of the funds *would* result in pecuniary damages to the church and, therefore, an action under the Criminal Victim's Relief Act—as well as criminal charges—would be appropriate. We therefore dismiss the Trustees argument here.

Notwithstanding these facts, the Trustees go on to argue that they, *as individuals,* suffered pecuniary losses by virtue of the fact that they were required to bring this case and that they therefore paid attorney fees from their own personal funds. We note first that the trial court's orders have repeatedly emphasized that GSM is responsible for all attorney fees in this case on behalf of both parties, and the New Officers do not challenge any of these rulings on appeal. Further, we note that the Trustees did not file this suit as individuals, but on behalf of GSM, making GSM the only party-in-interest to which the Crime Victim's Relief Act can apply. Nevertheless, we address the Trustees' argument that our case law, specifically *Harco, Inc. of Indianapolis v. Plainfield Interstate Family Dining Assocs.,* 758 N.E.2d 931 (Ind.Ct.App.2001), mandates that attorney fees be considered under the Act. *Id.* at 30 ("By clear implication, the rule

from *Harco* is that attorney fees alone may provide the 'pecuniary loss' required for recovery under I.C. 34–24–3–1 ....").

■ *Harco, Inc.* involved a claim under which attorney fees were awarded *pursuant to Indiana Code § 34–52–1–1(b)(1),* which provides for an award of attorney fees where a defendant is required to defend against a frivolous or bad faith lawsuit. We affirmed an award of attorney fees, specifically and repeatedly noting that the fees were properly awarded pursuant to the frivolous claims provision; however, we reversed the trebling of those attorney fees under the Crime Victim's Relief Act and held, *very clearly,* that the Act does not allow for the consideration of attorney fees as part of the pecuniary losses required to entitle a party to recovery under the statute. *Harco, Inc.,* 758 N.E.2d at 944, 945. Pursuant to Indiana Code § 34–24–3–1 and the clear holding of *Harco, Inc.,* the Trustees' payment of attorney fees, either individually or on behalf of GSM, does not support a claim under the Crime Victim's Relief Act. The trial court properly determined that the evidence was insufficient to support the Trustees' damages claim.

The trial court properly asserted jurisdiction when it ordered an election to determine who should serve on GSM's Board of Trustees, and it properly denied the Trustees' claims under the Crime Victim's Relief Act. Accordingly, we affirm.

Affirmed.

ROBB, J., and MATHIAS, J., concur.